

GREENE BROILLET & WHEELER, LLP
LAWYERS
100 WILSHIRE BOULEVARD, SUITE 2100
P.O. BOX 2131
SANTA MONICA, CALIFORNIA 90407-2131
TEL. (310) 576-1200
FAX. (310) 576-1220
BRUCE A. BROILLET, State Bar No. 63910
Email: bbroillet@greene-broillet.com
MARK T. QUIGLEY, State Bar No. 123228
Email: mquigley@greene-broillet.com
SCOTT H. CARR, State Bar No. 156664
Email: scarr@greene-broillet.com

Attorneys for _____ Plaintiff

(SPACE BELOW FOR FILING STAMP ONLY)

FILED
CLERK, U.S. DISTRICT COURT

MAY - 5 2010

CENTRAL DISTRICT OF CALIFORNIA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

WILSON ARLINGTON COMPANY,
a California Limited Partnership,

Plaintiff,

vs.

HYATT CORPORATION, a Delaware
corporation, HYATT HOTELS
CORPORATION, a Delaware
corporation, and DOES 1 through 50,
inclusive,

Defendants.

CASE NO. CV10 3372 DSF (FFM

**COMPLAINT FOR DAMAGES**

1. BREACH OF CONTRACT

2. FRAUD/CONCEALMENT

3. BREACH OF FIDUCIARY DUTY

4. NEGLIGENT MISREPRESENTATION

5. ACCOUNTING

DEMAND FOR JURY TRIAL

Plaintiff, Wilson Arlington Company, hereby complains and alleges as follows:

## GENERAL ALLEGATIONS

1.      Wilson Arlington Company is a California limited partnership with its principal place of business in Los Angeles, California.

-1-
COMPLAINT FOR DAMAGES

1ADA.05

2.     Hyatt Corporation and Hyatt Hotels Corporation (collectively "Hyatt") are Delaware corporations with their principal place of business in Chicago, Illinois and are qualified to do business in the State of California.

3.     Plaintiff is informed and believes and alleges upon such information and belief that Defendant Hyatt has, at all times pertinent herein, been transacting business throughout the State of California.

4.     The exact names of capacities of Does 1-50 are unknown to Plaintiff at this time.  Amendment(s) to this complaint will be filed as the names and capacities of said Doe Defendants become known.

5.     Plaintiff is informed and believes and alleges upon such information and belief that each and every Defendant, including the Doe Defendants was and is an agent and/or employee, joint venturer, representative, principal of each and every other Defendant in all of the acts complained of herein.

## **JURISDICTION**

6.     Jurisdiction is founded upon 28 U.S.C. § 1332(a).  The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

## **VENUE**

7.  Venue is proper in this Court pursuant to 18 U.S.C. Section 1965(a) and 28 U.S.C. Section 1391(a), in that Hyatt transacts business in Los Angeles, the Management Agreement at issue was entered into in Los Angeles and many of the

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1  obligations under breach of the Management Agreement were performed in Los
2  Angeles.  (A copy of the Management Agreement is attached as Exhibit 1.)

3

4      8. Plaintiff previously filed a breach of contract action against Hyatt
5  Corporation on December 19, 2008 in Arlington County, Virginia, Case No. 08-1539.

6

7      9. On November 6, 2009, the Virginia Court ordered a non-suit of Plaintiff's
8  claim pursuant to Virginia Code § 8.01-380.  (Exh. 2, Court Order.)

9

10                                    **FACTS**

11

12  **A.       The Nature and Basis of This Lawsuit**

13

14      10.       This Complaint arises out of the wrongful acts committed by Hyatt
15  in connection with its management of a hotel owned by Wilson Arlington and located
16  at 1325 Wilson Boulevard, Arlington, Virginia, known as the Hyatt Arlington (the
17  "Hotel").  At all times mentioned herein, Hyatt intentionally misrepresented the facts,
18  produced false and misleading documentation to Plaintiff in California, withheld and
19  concealed documentation and information from Plaintiff and/or otherwise acted with
20  the intent to trick and/or deceive Plaintiff so as to prevent, and which did prevent,
21  Plaintiff from discovering the true nature and extent of Hyatt's conduct which, in turn,
22  prohibited and/or otherwise deterred the Plaintiff from filing his lawsuit against Hyatt.
23  Said conduct by Hyatt included, but is not limited to, writing letters to Plaintiff to
24  convince him that there were no accounting improprieties, sending the Plaintiff false
25  audit reports at the corporate and hotel level, providing the Plaintiff with false business
26  plans year after year, all for the purpose of concealing its misconduct and fraud and
27  deterring the Plaintiff from filing suit.  It was not until on or about June 11, 2008 that
28

1ADA.05

1   designed to damage and deceive the Plaintiff, all of which obstructed thfiling of this

2   action until the above concealment was discovered.

3

4   　　　　11.　　　Hyatt managed the Hotel pursuant to the Management Agreement,

5   dated February19, 1981. True and correct copies of the Management Agreement and

6   its Amendments are attached hereto as Exhibit 1, and are collectively referenced

7   hereinafter as the "Management Agreement."

8

9   　　　　12.　　　When the Management Agreement was first executed, the Hotel was

10  owned by Prudential Insurance Company of America ("Prudential"). Hyatt managed

11  the Hotel as Prudential's agent, fiduciary, and trustee until March 1985, when Wilson

12  Arlington purchased the Hotel from Prudential. Wilson Arlington assumed all of the

13  rights and obligations under the Management Agreement. Wilson Arlington is also

14  referred to herein as the "Owner."

15

16  　　　　13.　　　From that point until December 31, 2006, Hyatt managed the Hotel

17  as Wilson Arlington's agent, fiduciary, and trustee. Wilson Arlington sold the Hotel to

18  a third-party on December 31, 2006.

19

20  　　　　14.　　　Pursuant to the Management Agreement, Hyatt agreed to serve as

21  the Owner's agent in the operation of the business of the Hotel; as a trustee in handling

22  and managing the Owner's funds and accounts in connection with the Hotel; and as a

23  fiduciary by virtue of the relationship of confidence created by, and trust reposed in

24  Hyatt under, the Management Agreement. In addition to the duties attendant to its roles

25  as the Owner's agent, trustee, and fiduciary, Hyatt also agreed to abide by the specific

26  duties and covenants set forth in the Management Agreement.

27  ///

28  ///

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

-4-
COMPLAINT FOR DAMAGES

15.     As set forth more fully herein, Hyatt materially breached the Management Agreement, engaged in fraudulent activities and breached its duties as the Owner's agent, trustee, and fiduciary, by among other things:

(a)   engaging in undisclosed self-dealing transactions with its Affiliates;

(b)   retaining and failing to disclose, account for, and remit to the Owner all monies and other consideration given to Hyatt and/or its Affiliates by vendors who supplied goods or services to the Hotel;

(c)   improperly charging the Owner for Hyatt's corporate overhead and overhead costs of Affiliates of Hyatt;

(d)   improperly charging the Owner for expenses incurred in connection with Hyatt-managed hotels located outside the United States;

(e)   furnishing false and misleading financial statements for the Hotel to the Owner for the purpose of preventing Plaintiff from discovering the true facts about Hyatt's misconduct;

(f)   failing to properly account for and return to the Owner the fees, allowances, charges, commissions, bonuses, discounts, rebates, profits and/or kickbacks paid to Hyatt and its Affiliates by virtue of its management of the Hotel;

(g)   providing false, inconsistent and misleading information to the independent auditors reviewing the Hotel's books and records and the auditors reviewing Hyatt's corporate financial statements;

(h)   providing false, inconsistent, and misleading information to the Owner regarding Hyatt's dealings with its Affiliates and the actual revenues and expenses associated with the Hotel;

(i)   providing false and misleading information about the Hotel's capital improvement needs, thereby damaging the Owner's ability to sell the Hotel to a third-party;

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

COMPLAINT FOR DAMAGES

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1   (j)   retaining and failing to account for and remit to the Owner all of the

2         intangible property, including customer information, that was created

3         and collected by Hyatt in its capacity as Wilson Arlington's agent,

4         fiduciary, and trustee; and

5   (k)   Deliberately withholding documentation from the Plaintiff for the

6         purpose of preventing the Plaintiff from discovering Defendants'

7         misconduct.  Said documents were not discovered by the Plaintiff

8         until on or about June 11, 2008, and more fully in June, 2009 when

9         Hyatt was sanctioned $100,000.00 and ordered by the Virginia Court

10        to produce documents previously withheld and/or declared by Hyatt

11        and its attorneys, not to exist at all.  (*See* Exh. 3, Court Order.)

12   16.   At all times, Hyatt was acting intentionally, knowingly, and in willful

13   disregard of the rights of the Owner and its obligations under the Management

14   Agreement for the purpose of tricking or deceiving Plaintiff so as to disguise Hyatt's

15   misconduct and prevent Plaintiff from learning the true facts.

16

17   **B.**   **Hyatt's Role as Wilson Arlington's Agent, Trustee, and Fiduciary under the**

18        **Management Agreement**

19

20   17.   Pursuant to the Management Agreement, Hyatt agreed to manage the Hotel

21   for the account of the Owner and to manage the Hotel in accordance with the terms of

22   the Agreement. (Management Agreement at 2 & § 3.1(a).)

23

24   18.   The Management Agreement gave Hyatt extensive authority as the

25   Owner's agent, trustee, and fiduciary. At all times relevant to this Complaint, Hyatt

26   held itself out as the Owner's agent, trustee, and fiduciary, and purported to act as the

27   Owner's agent, trustee, and fiduciary.

28

1ADA.05

19.   The Management Agreement provided that Hyatt's management and operation of the Hotel "shall include and extend to, among others, the operation of the Hotel for all activities which are customary and usual to a hotel business; the charges to be made for rooms and commercial space other than space leased to concessionaires, for entertainment and amusement, and for food and beverages; the labor policies of the Hotel (including wage rates, the hiring and discharging of employees, and the installation of employee retirement and other benefit plans . . .); and all phases of promotion and publicity." (Management Agreement, § 3.1.)

20.   Section 3.1 of the Management Agreement specifically authorized Hyatt to negotiate and enter into such reasonable contracts as agent for Owner as may be necessary or advisable in connection with operation of the Hotel, subject to Owner's written approval of three categories of contracts: (1) contracts having a term of greater than one year; (2) contracts binding the Owner for more than $10,000; and (3) contracts with corporations or persons controlling, controlled by, under the common control of, or affiliated with Hyatt ("Affiliates").

21.   Under the Management Agreement, Hyatt also agreed to act as the Owner's trustee and fiduciary in managing and handling the Owner's funds. Hyatt possessed and controlled the books and records for the Hotel. Hyatt also directly controlled the preparation, generation, and transmission of the financial statements for the Hotel to the Owner.

22.   As the Owner's trustee and fiduciary, Hyatt had the authority, under the Management Agreement, to establish and manage Operating Accounts which would hold all monies advanced by Wilson Arlington as working capital for the operation of the Hotel and all monies received by Hyatt on the Owner's account from the operation of the Hotel. The Management Agreement specifically directed Hyatt to hold all funds

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

in the operating accounts in trust for the Owner, and provided specifically that the bank or banks holding the accounts were to be so instructed in writing.

23.   As the Owner's trustee, Hyatt had the authority under the Management Agreement to reimburse itself out of the operating accounts for only those costs and expenses that it incurred in connection with the operating of the Hotel.

24.   As another example of the relationship of trust contemplated and created by the Management Agreement, Section 5.1 authorized Hyatt to establish and manage a Reserve Account for the purchase of Furnishings and Equipment, and for expenditures for certain capital improvements. The Management Agreement stated that the monies in the Reserve Account were "the property of Owner," and required Hyatt to maintain the account as a fiduciary "in trust for Owner."

25.   By virtue of the relationship of trust and confidence created by the Management Agreement, Hyatt owed strict fiduciary duties to Wilson Arlington, including the duties of care and loyalty. Hyatt was obligated to act in the best interests of Wilson Arlington and not to engage in self-dealing to the detriment of Wilson Arlington.

26.   In addition to its strict fiduciary duties to the Owner, Hyatt also had a duty to comply with the specific covenants set forth in the Management Agreement that dictated the manner in which Hyatt's obligations would be performed.

27.   For example, the Management Agreement specifically required Hyatt to permanently keep "complete, accurate and separate books of account and other records reflecting the results of the operation of the Hotel" and to keep such books and records "in all material respects in accordance with generally accepted accounting principles

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

consistently applied." (Management Agreement, § 7.4.) Within 20 days after the end of each calendar month, Hyatt was required to deliver to the Owner an unaudited financial statement prepared from the books maintained by Hyatt which included a statement of current assets and liabilities, a profit and loss statement, the Hotel's gross receipts, and a comparison of actual income and expenses to forecast income and expenses. (*Id.*)

28.    The Management Agreement specified various reports that Hyatt was required to provide to the Owner, such as schedules for compensation and bonuses for executive Hotel staff, statements supporting the charges assessed by Hyatt for Chain Expenses (as explained in further detail below), annual budgets, capital budgets, and marketing plans, and financial statements.

29.    As another example, the Management Agreement also specified the transactions for which Hyatt was required to obtain the Owner's written approval for contracts whose term exceeded more than one year, which bound the Owner for any amount in excess of $10,000, or which involved "a corporation or a person or persons controlling, controlled by, under common control of, or affiliated with Hyatt" ("Affiliates"). (Id., § 3.1.)

30.    In compensation for its services as the Owner's agent, trustee, and fiduciary, Hyatt was paid an Annual Management Fee to operate the Hotel, as provided in Section 4.2 of the Management Agreement. The Annual Management Fee was based, in part, on the profitability of the Hotel, which allowed Hyatt to benefit from improvements and increases in the Hotel's profitability.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

31.     The Management Fee was the only compensation that Hyatt was entitled to receive for its services as the Owner's agent, trustee, and fiduciary under the Management Agreement.

32.     Over the term of Hyatt's management of the Hotel, Hyatt collected more than $13 million in Annual Management Fees from the Owner.

## C.     Hyatt's Obligation to Provide Chain Services in Connection with the Operation of the Hotel Without Profit to Hyatt

33.     Under Section 7.2 of the Management Agreement, Hyatt promised to provide, or to cause its Affiliates, to provide "Chain Services" in connection with the operation of and for the benefit of the Hotel. Chain Services are those benefits, services, and facilities that Hyatt or its Affiliates generally make available to all hotels operated by Hyatt or its Affiliates under the Hyatt brand name.

34.     Section 7.2 identified the types of Chain Services provided by Hyatt and its Affiliates at the time. These included: (1) convention business and sales promotion services; (2) advertising, publicity and public relations services; (3) food and beverage, personnel and other operational departmental supervision and control services; (4) centralized reservations services in Omaha, Nebraska; and (5) making available qualified personnel through the Hyatt employee training program.

35.     The Management Agreement expressly prohibited Hyatt and its Affiliates from making any profit in connection with the provision of Chain Services. Section 7.2 stated: "Neither Hyatt nor any of its affiliates shall charge or receive any profit in respect of any such Chain Services."

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

COMPLAINT FOR DAMAGES

1ADA.05

36.     "Chain Expense" was defined in the Management Agreement as a subset of Chain Services. The Chain Expense for a given period was the cost incurred in that period by Hyatt or its Affiliates in respect of Chain Services, "other than the costs of food and beverage, personnel and other operational departmental supervision and control services." (Management Agreement § 7.2 (emphasis added).) In other words, by excluding those Chain Services from Chain Expense, the Management Agreement expressly prohibited Hyatt from charging the Owner for the cost of services provided by its food and beverage departments, its human resources departments, operational departments, and the other departments that are part of the services that Hyatt was required to provide in consideration for the Annual Management Fee.

37.     The Management Agreement also allowed Hyatt to pass on the costs of only some Chain Expense to the Hotel, called "Allocable Chain Expense."

38.     Section 7.2 defined "Allocable Chain Expense" as all Chain Expense minus the cost of Chain Services furnished to hotels outside of the United States or U.S. hotels that were not open to the public. The Hotel's pro rata share of the Allocable Chain Expense was to be calculated on the basis of the ratio of the number of guest rooms at the Hotel to the average number of guest rooms at all then-open hotels in the United States operated by Hyatt or its Affiliates. (Management Agreement, § 7.2.)

39.     Section 7.2 permitted Hyatt to reimburse itself out of the operating accounts for only the Hotel's Allocable Chain Expense.

40.     In addition to Hyatt's duties to maintain the Hotel's books and accounts in accordance with generally accepted accounting principles and to prepare and furnish financial statements to the Owner, Hyatt also had a specific obligation, under section

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

7.2 of the Management Agreement, to justify its Allocable Chain Expense to Wilson Arlington by furnishing detailed statements with data supporting the charges.

41.     During Wilson Arlington's ownership of the Hotel, the fees that Hyatt billed to the hotels as Chain Expense grew astronomically. In 1989, the Chain Expense claimed by Hyatt was approximately $28.5 million. By 2005, the total Chain Expense charged by Hyatt had ballooned to nearly $60 million.

42.     Over that time period, the number of hotels operated by Hyatt grew tremendously.  Because the Hotel's share of Chain Expense for any period was to be calculated based on the ratio of the number of guest rooms at the Hotel to the average number of guest rooms at all then-open hotels in the United States operated by Hyatt, an increase in the number of Hyatt-operated hotels should have had the effect of decreasing the Hotel's allocation of Chain Expense. Instead, the Chain Expense allocated to the Hotel increased almost every year.

43.     Hyatt paid itself more than $4 million as Allocable Chain Expenses out of the operating accounts that it managed on Wilson Arlington's behalf.

44.     Over the course of the more than twenty years that Hyatt operated the Hotel as Wilson Arlington's agent, trustee, and fiduciary, Hyatt routinely paid itself Wilson Arlington's funds for costs that it billed as Allocable Chain Expenses, but that Hyatt knew were not properly Allocable Chain Expenses under the Management Agreement.

45.     Hyatt also made secret profits from Chain Services and expenses billed to Wilson Arlington and other Hyatt-branded hotels as Allocable Chain Expense, in contravention of the express provisions of the Management Agreement.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-12-
COMPLAINT FOR DAMAGES

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

46.    Year after year, Hyatt concealed these improper charges from Wilson Arlington.  Hyatt perpetrated this concealment by setting up affiliated companies that Hyatt used to funnel and disguise improper charges, preparing false and misleading financial statements, providing false and misleading information to the auditor of the Hotel's books and records, providing false and misleading information to the auditor reviewing the financial statements pertaining to Hyatt's corporate chain wide programs and practices, and causing Wilson Arlington to receive audited financial statements that Hyatt knew to be false and misleading.

47.    For example, knowing that the management agreements with Wilson Arlington and other owners prohibited Hyatt from charging for overhead expenses associated with Chain Services as Chain Expenses, Hyatt set up companies that it controlled or that were under the common control of Hyatt and that would incur those charges and then pass them on to Hyatt-managed hotels as Chain Expense.

48.    Regency Systems Solutions ("RSS") is one such example. Because Hyatt could not directly charge hotel owners like Wilson Arlington for the costs of building or maintaining its computer system, Hyatt created RSS, which, on information and belief, built and maintained Hyatt's computer system for reservations. No later than 1990, RSS, on information and belief, billed Hyatt's Omaha reservation center for every expense associated with building, supporting, and maintaining Hyatt's computer reservation system, including personnel and overhead expenses.

49.    Hyatt, in turn, termed these expenses under the general category of "Omaha reservations" and passed all of those costs on to Wilson Arlington and the other owners of Hyatt-managed hotels as Chain Expense.

///

///

1ADA.05

50.     As another example, Hyatt set up a company called Randy Rezco. On information and belief, Randy Rezco's sole purpose was to accumulate the costs of developing a new reservation system for Hyatt. After the reservation system was built, Randy Rezco billed another Hyatt Affiliate, Hyatt Tech Corporation, for those costs. Hyatt Tech, in turn, billed those costs to Hyatt's Omaha reservation center, and Hyatt passed those costs on to Wilson Arlington and other owners of Hyatt-managed hotels as Chain Expense.

51.     As yet another example, Hyatt, in 2001, built a data center at a price of more than $5 million. Hyatt charged the cost of the data center as Chain Expense, without disclosing the nature or size of the transaction to the Owner.

52.     In 2001, Hyatt also invested nearly $4 million in Avendra LLC, a joint venture that Hyatt formed with Marriott Corporation, and others. Hyatt billed its investment in Avendra to the Owner as part of Chain Expense. Hyatt did not disclose to the Owner that it had charged its investment in Avendra as part of Chain Expense. Nor did Hyatt return to the Owner the sizeable payments that it has received by virtue of Hyatt's investment in Avendra.

53.     At no time did Hyatt disclose to Wilson Arlington that it was using "the Omaha reservations" label to charge Wilson Arlington and other owners for operational expenses, investments, and capital improvements that were expressly excluded from Chain Expense under the Agreement. Nor did Hyatt disclose to or share with Wilson Arlington the full extent of the payments it received or the profits it made in respect of Chain Services.

54.     On the contrary, Hyatt went to great lengths to conceal its contractual and fiduciary breaches. It provided the Owner with financial statements that purported to

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

1    represent the Hotel's actual financial performance and that had been reviewed by

2    independent auditors. Those financial statements on their face betrayed no clue of the

3    falsehoods and material omissions on which they were based.

4

5    55.    In fact, the most significant items on the Hotel's financial statements did

6    not even come from the records maintained at the Hotel—the records to which the

7    auditor of the Hotel's books was given access. Rather, those items—which included

8    the Hotel's allocated Chain Expense—came from Hyatt's corporate headquarters,

9    which transmitted the amounts, without back-up, to the Hyatt employees managing the

10   Hotel's day-to-day operations who simply plugged those amounts into the financial

11   statements they prepared for the Hotel.

12

13   56.    Hyatt also represented that its corporate-level financial statements were

14   being independently audited, while it made material misrepresentations to, and

15   withheld material information from, the auditors who reviewed Hyatt's corporate-level

16   financial statements. Because they were based on Hyatt's material misrepresentations

17   and omissions, the auditors' reviews of Hyatt's corporate-level financial statements

18   were, in fact, meaningless.

19

20   57.    Nonetheless, Hyatt incorporated the same false and misleading

21   information taken from its corporate-level financial statements into the financial

22   statements that it prepared for the Hotel. These included such things as the Hotel's

23   share of Allocable Chain Expense, the Gold Passport fees assessed to the Hotel, and

24   disclosures (or, more accurately, non-disclosures) of Hyatt's related-party transactions.

25   The auditors reviewing the Hotel's financial statements relied upon Hyatt's

26   corporate-level financial statements in their review, and opined that the Hotel's

27   financial statements complied with the Management Agreement. As a result, the Owner

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

1   received false and misleading financial statements that were intended to, and did,

2   conceal Hyatt's misdeeds.

3

4       58.   Among the things that Hyatt concealed from the auditors was the true

5   nature of the items being billed to Wilson Arlington as Chain Expense.

6

7       59.   For example, Hyatt did not disclose to the auditor reviewing Hyatt's

8   corporate-level financial statements the number, extent, and nature of the related-party

9   transactions in which Hyatt had engaged that directly affected the amounts that Hyatt

10  charged to the Hotel as Chain Expense.

11

12      60.   Hyatt also directly misrepresented to the auditors reviewing Hyatt's

13  corporate-level financial statements what Chain Services it was permitted to charge the

14  owners of Hyatt-managed hotels as Chain Expense.

15

16      61.   Since at least 2002, Hyatt knowingly misrepresented to the auditor that all

17  of the management agreements between Hyatt and hotel owners contained a "standard"

18  definition of Chain Expense. Hyatt further misrepresented to the auditor that all of the

19  management agreements allowed Hyatt to charge hotel owners for the direct costs of

20  providing any Chain Service, including any personnel and overhead costs, such as

21  occupancy costs, costs of equipment leases and capital improvements, and amortization

22  of capital costs.

23

24      62.   This misrepresentation was made knowingly and intentionally because

25  Hyatt knew that it did not have the same management agreement with every owner. In

26  fact, the Management Agreement between Hyatt and Wilson Arlington expressly

27  prohibited Hyatt from charging for personnel and overhead as Chain Expense.

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

COMPLAINT FOR DAMAGES

1ADA.05

63.     Hyatt also knowingly misrepresented to the auditor reviewing Hyatt's schedule of Chain Expenses that all of its management agreements with owners obligated Hyatt to deduct from Chain Expense charges only those amounts to which Hyatt and its Affiliates were entitled to receive from hotels outside the United States, Canada, and the Caribbean or for any hotel located in the United States, Canada, or the Caribbean that was not open to the public. In other words, Hyatt told the auditor that all of its management agreements allowed Hyatt to allocate among owners expenses for hotels located in Canada and the Caribbean, as well as the United States.

64.     In fact, Hyatt's Management Agreement with Wilson Arlington permitted Hyatt to allocate to Wilson Arlington the expenses associated with Hyatt-managed hotels located only in the United States, and not including hotels in Canada or the Caribbean. The Management Agreement required Hyatt to deduct from Chain Expense any amounts payable to Hyatt from hotels outside the United States.

65.     Hyatt did not disclose to Wilson Arlington that it had falsely informed the auditor that all management agreements were standard, and had intentionally caused the auditors to test Hyatt's Chain Expense against contracts that were materially different than its Management Agreement with Wilson Arlington.

66.     Hyatt also caused the Owner to receive financial statements that the auditor stated complied with the terms of the Management Agreement. Hyatt prepared financial statements for the Hotel that included Chain Expense allocations that were false, inaccurate, and misleading.

67.     Hyatt also failed to provide Wilson Arlington copies of the Chain Expense audit reports as they were issued.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

68.     Even when Hyatt did provide the Chain Expense audit reports to Wilson Arlington, years after the fact, they were false, misleading, and incomplete.

69.     The Chain Expense audit report for 2000 and 2001, for example, stated, in circular fashion, only that the schedules contained therein represented the total expenses incurred by Hyatt and its Affiliates "for Chain Expense, as defined," without stating what that definition was. The Chain Expense audit report also stated expressly that the schedules contained therein were "not intended to be a presentation in conformity with accounting principles generally accepted in the United States of America." The report used only broad categories such as "telephone" and "other expenses, net" and did not explain all the overhead costs that Hyatt and its Affiliates were, in fact, charging as Chain Expense.

70.     Nor did Hyatt ever disclose to the Owner that the scope of the auditors' engagement essentially was limited to reviewing the accuracy of Hyatt's arithmetic. The auditors were not asked to, and did not opine on, the fairness of Hyatt's allocation methodology or whether the expenses that Hyatt allocated to the Hotel as Chain Expense had, in fact, been incurred in connection with the provision of chain services for which Hyatt was permitted to charge the Owner.

71.     To date, Hyatt has failed to adequately explain the more than $4 million that it collected from Wilson Arlington's funds as Allocable Chain Expense.

///
///
///
///
///

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

-18-
COMPLAINT FOR DAMAGES

**D.** **Hyatt's Secret Kickback Schemes and Arrangements with Vendors Who Supplied the Hotel**

72.     Under the Management Agreement and as the Owner's agent and fiduciary, Hyatt had a duty to enter into contracts that were fair and fully competitive, and that did not benefit Hyatt or its Affiliates at the expense of the Owner.

73.     The Management Agreement also expressly required Hyatt to obtain the Owner's written approval for contracts with a term greater than one year (including renewals), and contracts with any person or entity controlling, controlled by, under the common control of, or affiliated with Hyatt.

74.     Even though the Management Agreement limited Hyatt's compensation to the Annual Management Fee, and even though Hyatt was paid more than $13 million in Annual Management Fees, Hyatt received and kept additional monies and payments from the operation of the Hotel. In violation of Hyatt's duties to the Owner, Hyatt routinely and secretly benefitted at the Owner's expense and retained monies attributable to the operation of the Hotel that rightfully belonged to the Owner.

75.     Purporting to act on behalf of the Owner, Hyatt negotiated and entered into contracts with vendors for the purchase of goods and services for which Hyatt and/or its Affiliates received kickbacks from the vendors. In order to hide them from the Owner, Hyatt disguised the kickbacks in a number of ways, using such subterfuges as calling them allowances, charges, commissions, bonuses, discounts, rebates, and sponsorships.

76.     Hyatt intentionally concealed the existence, amount, and extent of these kickbacks from the Owner.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

77.   Even though the kickbacks derived from the operation of the Hotel and rightfully belonged to the Owner, Hyatt and/or its Affiliates secretly retained the kickbacks.

78.   Hyatt prepared false and fraudulent financial statements, which failed to disclose the existence and/or extent of the kickbacks paid to Hyatt and/or its Affiliates by virtue of Hyatt's operation of the Hotel.

79.   Hyatt, on information and belief, knowingly withheld information, misled, and/or misrepresented to the auditors reviewing the Hotel-level financial statements and the Hyatt corporate-level financial statements the existence, extent, and nature of the kickbacks received by Hyatt and/or its Affiliates from vendors who supplied goods and services to the Hotel.

80.   Hyatt also intentionally disseminated false and misleading information to the Owner in its "Annual Business Plans." Though Hyatt touted the Annual Business Plans to owners as disclosure documents, it actually used the documents to provide misleading, incomplete, and at times even false, information to the Owner about such material subjects as the relationships between Hyatt and its vendors, the terms of the agreements with vendors, the existence and amount of rebates paid by vendors, how those rebates were applied by Hyatt, and the competitiveness of the prices charged by Hyatt's Affiliates and third parties.

81.   One example of Hyatt's secret kickback arrangements with vendors is Hyatt's arrangement with AT&T. Beginning no later than 1988, and through the termination of the Management Agreement on December 31, 2006, Hyatt received rebates, commissions, and other kickbacks from AT&T, by virtue of the operation of the Hotel.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

82.     One such agreement was Hyatt's "zero-plus" dialing agreement with AT&T. From 1989 through approximately March 1991, Hyatt and AT&T were parties to an agreement pursuant to which AT&T paid Hyatt a commission for every zero-plus call that was made by a Hyatt-brand hotel using AT&T. A zero-plus call is a call initiated by a hotel guest who dials zero plus a number, is connected to an operator, and then, through a credit card, third-party billing or collect call, uses whatever long distance service the hotel has chosen.

83.     Pursuant to this zero-plus agreement, Hyatt received a commission of $0.20 per zero-plus call. In 1989, Hyatt received more than $1 million in commissions pursuant to this agreement. In 1990, Hyatt received more than $1.2 million in commissions from AT&T under this zero-plus agreement. Hyatt retained these commissions in their entirety, returning none of these monies to the hotels that it managed.

84.     Hyatt never disclosed its receipt and retention of these commissions to Wilson Arlington. Nor did Hyatt seek or obtain Wilson Arlington's written approval to enter into the zero-plus agreement, whose term exceed more than one year.

85.     Hyatt and AT&T entered into a new zero-plus agreement in April 1991. This agreement had a term of three years.

86.     Once again, Hyatt did not seek or obtain Wilson Arlington's written approval of the agreement.

87.     In the new AT&T agreement, Hyatt represented that it was authorized to receive commissions from AT&T with respect to all current Hyatt locations, which included the Hyatt Arlington.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

88.   Hyatt received $3 million in up-front commissions and bonuses upon executing the April 1991 zero-plus agreement. Hyatt received this money as a $720,000 signing bonus, plus advance commissions in the amount of $2,280,000.

89.   Hyatt retained the $720,000 signing bonus in its entirety. Hyatt also retained approximately $380,000 of the advance commissions. In total, Hyatt retained approximately $1.1 million of the $3 million it received from AT&T upon signing the April 1991 agreement.

90.   In subsequent years, beginning with 1992, Hyatt retained $0.06 of each $0.38 per call commission that it received from AT&T. Hyatt estimated that it would retain $360,000 per year in commissions from AT&T in the second and third years of the April 1991 zero-plus agreement.

91.   In August 1991, Hyatt sent a memorandum to its general managers—who were employees of Hyatt, and not the hotel owners—stating that Hyatt had recently signed an agreement with AT&T to provide operator-assisted services that were to include a competitive commission schedule.

92.   Even that document did not mention that Hyatt had received and retained commissions from 1989 through approximately March 1991 pursuant to an earlier agreement with AT&T.

93.   The August 1991 memorandum did not disclose that Hyatt had received and retained a signing bonus from AT&T upon executing the April 1991 agreement.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

94.    The August 1991 memorandum did not disclose that Hyatt had received advanced commission payments of $2,280,000, and retained a significant portion of those monies for itself.

95.    The August 1991 memorandum also directly misstated the per call commission amount as $0.32 per call, despite the fact that the actual amount being paid by AT&T to Hyatt was $0.38. Hyatt did not disclose that it was retaining $0.06 per call for itself.

96.    Hyatt took additional steps to prevent Wilson Arlington from discovering that Hyatt was pocketing a portion of the AT&T commissions. Hyatt directed AT&T to send the commission checks to Hyatt, rather than to the individual hotels, even though it knew that AT&T was capable of sending individual commission checks to each hotel. Hyatt instructed AT&T employees not to discuss the commissions with the hotels, and to refer any inquiries from hotels regarding commissions to Hyatt.

97.    Any argument that Hyatt retained a portion of these commissions to offset expenses related to negotiating and implementing the April 1991 zero-plus agreement is belied by the manner in which Hyatt recorded these commissions on its books. Hyatt did not use the commissions it received from AT&T to offset the expenses of any of its departments. Instead, Hyatt recorded the income it received from the zero-plus commissions to an account known as the "Hyatt Corporation President's Office." That was the same account used to pay the salaries of the members of the Pritzker family that owned and ran Hyatt. On information and belief, the same account also was referred to within Hyatt as "California Hyatt."

98.    More than ten years after entering into the April 1991 agreement, Hyatt, in response to pointed requests for information from Wilson Arlington, and after

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-23-
COMPLAINT FOR DAMAGES

1ADA.05

having been sued by other owners, made some incomplete, misleading disclosures regarding its kickback agreements with AT&T.

99.   In late 2001, Hyatt revealed to Wilson Arlington some of the terms of its April1991 zero-plus agreement. Hyatt revealed that it had received $3 million in a signing bonus and up-front commissions, and that Hyatt retained $0.06 per call through March 1994.

100.   But even then, Hyatt did not return the kickbacks that it had improperly retained.

101.   Nor did Hyatt disclose its receipt and retention of over $2 million in commissions from AT&T in 1989 and 1990.

102.   Hyatt's actions in connection with its agreements with AT&T constitute breaches of the Management Agreement. Hyatt received kickbacks from AT&T, retained a significant portion of these monies for itself, and not only failed to disclose the true nature of its AT&T agreements to Wilson Arlington, both misrepresented the true facts and actively misled Wilson Arlington regarding material terms of these agreements for the purpose of preventing Wilson Arlington from discovering the true facts.

**E.    Hyatt's Sham Company, MT Phone**

103.   In early 1990, Hyatt created a shell company, known as MT Phone Company ("MT Phone"), for the purpose of rebilling Hyatt-managed hotels for telephone services at marked up prices.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

104.    MT Phone was created shortly after Hyatt entered into a rate agreement with AT&T, known as the Tariff 12 Agreement.

105.    For a period of one or two years, MT Phone had only one full-time "employee." After that, it had two full-time "employees," one of whom was a clerical assistant. Other Hyatt personnel were involved with MT Phone on a part-time basis.

106.    MT Phone served as a vehicle through which Hyatt could rebill Hyatt-managed hotels for telephone services at rates higher than those Hyatt had negotiated with AT&T and memorialized in the Tariff 12 Agreement.

107.    MT Phone did not have a contract with AT&T. AT&T entered into the Tariff 12 Agreement with Hyatt. MT Phone was neither a party to, nor an assignee of, that agreement. MT Phone did not even receive AT&T's bills. Rather, those bills went directly to Hyatt.

108.    Nonetheless, Hyatt falsely and misleadingly described MT Phone as "an entity created to establish credit with AT&T and act as a clearing house for all bills."

109.    From its inception in 1990 until 1994, MT Phone marked up the rates provided to Hyatt-managed hotels by AT&T by 10%.

110.    Beginning with November 1990 and continuing through December 2001, MT Phone charged the Hotel on a monthly basis. In total, Hyatt charged the Hotel $457,950.42 through monthly MT Phone invoices during this time period.

1ADA.05

111.   MT Phone's revenues were significant. At the end of MT Phone's first fiscal year, January 31, 1992, MT Phone declared a dividend of $1.8 million to its parent corporation, HG Inc., another Hyatt Affiliate.

112.   MT Phone declared another dividend of $1.8 million on October 31, 1994.

113.   In response to an inquiry from Wilson Arlington regarding MT Phone, in July 1996, Hyatt stated that MT Phone was "an organization that was set up to negotiate bulk long distance and data network agreements using the leverage of more than 150 company wide locations to obtain the large quantity discounts for all facets of network services used by Hyatt Hotels."

114.   In fact, MT Phone did not "negotiate" anything; Hyatt did. And MT Phone did not obtain "discounts" for "all facets of network services." On the contrary, MT Phone only marked up the costs of the services rendered by AT&T.

115.   After the owner of another Hyatt-managed hotel sued Hyatt, challenging Hyatt's practices with respect to MT Phone, among other things, Hyatt formulated a new description of MT Phone's function. Hyatt now claimed that MT Phone "repackages" services provided by AT&T.

116.   But Hyatt's so-called disclosure was false and misleading. Hyatt stated that Hyatt-brand hotels "reimbursed" MT Phone for "[c]osts incurred" "without a profit or mark-up component." The truth was the opposite: MT Phone was both making a profit and charging a mark-up.

117.   Further, Hyatt claimed that the "overall purposes of these services is to reduce long distance expenses to each hotel and provide consistent, quality

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

telecommunication services to hotel guests." This was also untrue. Hyatt executives had already testified there was no real purpose to MT Phone other than to make a profit for Hyatt.

118.   In the Annual Business Plan for 2000, Hyatt again changed its tune slightly. This time, Hyatt continued to assert that MT Phone did not charge the hotels for a "profit component," but no longer claimed that MT Phone did not charge a "mark-up."

119.   By the time Hyatt provided its Annual Business Plan for 2000, Hyatt dropped its claim that MT Phone's purpose was to "reduce long distance expenses." But Hyatt still did not disclose MT Phone's true purpose or its secret profits.

120.   Nor did Hyatt disclose that other hotel owners had sued Hyatt in connection with its MT Phone scam.

121.   After Wilson Arlington's repeated and pointed requests for information about MT Phone, Hyatt told the Owner, in late 2001 and 2002, that MT Phone was formed in order "to leverage volume commitments, resell its services to Hyatt and non-Hyatt entities, troubleshoot for the hotels, provide quality network support, assist with billing issues and/or disputes, conduct remote monitoring of the network and provide the hotels with hospitality oriented telecommunications expertise."

122.   Those representations, again, were contrary to the testimony Hyatt's own executives had already given by that point, and which the Owner discovered on or about June 11, 2008 and more fully in June 2009, that there was no particular reason for the formation of MT Phone other than for Hyatt to make a profit.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

123.   Hyatt continued to insist in other communications sent to Wilson Arlington that MT Phone "negotiates volume telecommunications agreements and obtains favorable rates." This description, again, was false.

124.   Hyatt also continued to insist, falsely, that the "costs incurred" by MT Phone and "reimbursed" by the hotels did not include a "profit component."

125.   On January 8, 2002, Hyatt sent a memorandum to its Controllers, summarily informing them that MT Phone Company would shortly be dissolved. Hyatt stated that each hotel would be billed individually and directly by AT&T beginning with the January 2002 invoice. The hotels were further informed that they "should be experiencing a sizable decline (25-35%) in their telecommunication costs (2001 versus 2000) based on Hyatt's new Tariff-12 agreement."

126.   Hyatt did not disclose that a significant portion of the cost declines would be the direct result of the discontinuation of Hyatt's practice of using MT Phone as a vehicle for marking up AT&T's rates.

127.   In response to Wilson Arlington's continued requests for information regarding MT Phone, Hyatt's Senior Vice President of Operations, Chuck Floyd, sent another letter, dated June 19, 2002, in which Hyatt significantly misrepresented MT Phone's financial position over the years. For example, the letter stated that "MT Phone's total net income (after taxes and including income from non-Hyatt customers of MT Phone)" was $1,186,114 for 1992. Hyatt's statements were misleading and intended to misrepresent MT Phone's true finances and the benefits that Hyatt had obtained through MT Phone. Nowhere did Hyatt disclose the $1.8 million dividend that MT Phone had declared to a Hyatt Affiliate for fiscal year 1992. Nor did Hyatt disclose

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

the $1.8 million dividend that MT Phone had declared to a Hyatt Affiliate for fiscal year 1994.

128.   Hyatt's unauthorized transactions with an affiliated shell company to receive and retain undisclosed payments from the mark-up and resale of telephone services to the Hyatt Arlington constitutes a breach of the Management Agreement and the fiduciary duties owed by Hyatt to Wilson Arlington.

**F.**     **Hyatt's Receipt of Kickbacks through its Affiliate, Rosemont**

129.   As the Owner's fiduciary and agent, Hyatt had a duty not to engage in self-dealing and not to benefit itself at the expense of the Owner. Indeed, the Management Agreement expressly provided that Hyatt could not, without the Owner's written approval, enter into any contracts with "a corporation or a person or persons controlling, controlled by, under common control of, or affiliated with Hyatt." (Management Agreement, § 3.1(a).)

130.   The Management Agreement provided only a single exception to this strict limitation. Under Section 3.1(a), Hyatt could contract with or otherwise appoint its affiliate, Rosemont Purchasing Company ("Rosemont"), to act as a purchasing agent for the Hotel, and to pay Rosemont a fee or fees for its services, provided that prices obtained through Rosemont were competitive and fair and the fee or fees paid to Rosemont were "no greater than those charged by Rosemont for comparable services performed for unaffiliated third parties." (Management Agreement, § 3.1(a).)

131.   The Management Agreement specifically required Hyatt to make available to the Hotel the same Chain Services provided by Hyatt and its Affiliates to other Hyatt-managed hotels. Chain Services was defined in the Management Agreement as

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

1   including "food and beverage" services. The Management Agreement also specifically

2   prohibited Hyatt and its Affiliates from making any profit in respect of such Chain

3   Services.

4

5   132.   In breach of these duties, and in breach of its fiduciary obligations to the

6   Owner, Hyatt, both directly and indirectly through Rosemont, received and retained

7   undisclosed kickbacks from food and beverage vendors who supplied the Hotel.

8

9   133.   Hyatt was able to obtain these lucrative arrangements with vendors by

10   negotiating so-called "national" contracts through which Hyatt, purporting to act as the

11   agent on behalf of the owners of Hyatt-managed hotels, promised that the vendors'

12   products or services would be purchased for and used in Hyatt-managed hotels. In

13   exchange, the vendors would pay kickbacks that were paid directly to Hyatt or its

14   Affiliates, and not to the owners of the Hyatt-managed hotels.

15

16   134.   These national agreements were negotiated and executed by Hyatt and

17   Rosemont without regard for the best interest of the owners of the Hyatt-managed

18   hotels, including Wilson Arlington. By mandating participation by all Hyatt-managed

19   hotels in these national contracts, Hyatt maximized the kickbacks received by its own

20   Affiliate, Rosemont, regardless of whether the vendors' products and services best

21   served the needs and interests of the Hotel.

22

23   135.   On information and belief, these kickback arrangements also inflated the

24   prices charged by the vendors to the Hotels, and Hyatt's interest in maximizing its own

25   kickbacks conflicted directly with its contractual and fiduciary duty to obtain the

26   vendors' goods and services at the lowest possible prices.

27

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

COMPLAINT FOR DAMAGES

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

136.   Hyatt intentionally did not share these national contracts or the terms of the agreements with the Owner.

137.   Even though the Management Agreement expressly required Hyatt to keep copies of all contracts that it entered into on behalf of the Owner on file at the Hotel, Hyatt intentionally did not do so.

138.   Hyatt did not share all the national contracts with even the Hyatt employees managing the day-to-day operations of the Hotel. The onsite managers were provided with and asked to execute addenda that merely referenced and incorporated the "master" national agreement, sight unseen.

139.   Even when the Owner specifically inquired about the existence and terms of Hyatt's and Rosemont's national agreements, and asked for copies of the national contracts, Hyatt refused to disclose their terms and refused to provide copies of the agreements themselves.

140.   In just the six-year period between 1987 and 1993, the kickbacks received by Hyatt and/or Rosemont from food and beverage vendors alone grew from approximately $200,000 to more than $2 million.

141.   On information and belief, this rapid growth in kickback amounts was achieved at the expense of the owners of the hotels managed by Hyatt, including Wilson Arlington.

142.   For years, Hyatt did not breathe a word about the existence of any rebates or other kickbacks to the Owner. In 1999, after being sued by the owners of other Hyatt-managed hotels on the basis of its secret kickback arrangements with vendors,

1ADA.05

among other things, Hyatt sent the Owner a 239-page Annual Business Plan in which it buried a brief, incomplete, and misleading discussion of Rosemont and Hyatt's National Contracts program. Hyatt stated, falsely, that Hyatt received "no fee, commission, or other remuneration" in connection with its National Contracts Program. Hyatt also stated that Rosemont, however, "may receive fees, commissions, or rebates on certain goods so provided (which includes a profit component)."

143.   Hyatt included the same incomplete and misleading statements in its Annual Business Plan for 2000.

144.   Nowhere did Hyatt disclose the extent or amount of the kickbacks received by Rosemont. Nor did Hyatt disclose that the profits made by Rosemont effectively went into Hyatt's own pocket, inasmuch as Rosemont was controlled by Hyatt.

145.   On multiple occasions in 2001 and 2002, Wilson Arlington inquired specifically about the extent and amount of rebates and other kickbacks received by Rosemont.

146.   Once again, Hyatt provided information that was incomplete, inaccurate, and intentionally misleading, the purpose of which was to trick and deceive Plaintiff in order to prevent Plaintiff from discovering the true facts and which in fact did prevent Plaintiff from knowing of Hyatt's misconduct. For example, Hyatt told Wilson Arlington that Rosemont received rebates and commissions for "only a small percentage of those items for which Rosemont arranged beneficial pricing."

147.   On information and belief, kickbacks and rebates were fairly common and routine in the national agreements negotiated by Hyatt and Rosemont.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

148. Hyatt also told Wilson Arlington that Rosemont retained the rebates and commissions paid by vendors "in lieu of charging a contractually permissible purchasing fee as set forth in section 3.1 of the Hotel's Management Agreement."

149. While the Agreement permitted Rosemont to charge a fee for its purchasing services, nothing in the Agreement permitted Rosemont to unilaterally opt to obtain and retain undisclosed amounts of kickbacks from vendors in lieu of charging such a fee.

150. Hyatt also said that Rosemont charged percentage purchasing fees on purchases of operating equipment, supplies, and furniture, fixtures, and equipment ("FF&E") for which, according to Hyatt, Rosemont received no rebates or commissions.

151. That statement, too, was false and misleading. On information and belief, Rosemont both charged the Owner a purchasing fee and received kickbacks from the vendors who sold FF&E to the Hotel.

152. Not only did Hyatt mislead and conceal the extent of its kickback schemes from the Owner, it also actively misled and concealed that information from the auditor.

153. In 1994, for example, during the course of an audit of Hyatt's financial records, Coopers & Lybrand discovered that Rosemont had received rebates from vendors selling goods and services to Hyatt-managed hotels. Even though Rosemont has been receiving rebates since at least 1987, Hyatt told the auditor that the rebate income was a new source of revenue that Rosemont had just started to receive in 1993.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-33-
COMPLAINT FOR DAMAGES

1ADA.05

154.   The auditor observed that, contrary to Hyatt's practices to that point, because the individual hotels pay for the products and services purchased through Rosemont, any rebates should be returned to the hotels.

155.   Nevertheless, Hyatt did not return the rebates to the individual hotels. Rather, Hyatt simply credited a fraction of the kickbacks received by Rosemont in 1993 and 1994 against Chain Expense, which again principally benefitted Hyatt.

156.   Through the termination of the Management Agreement on December 31, 2006, Hyatt continued to receive rebates from vendors, including Pepsi and Pegasus Solutions, that were attributable to the operation of the Hotel and that were not returned to the Owner.

157.   To date, Hyatt has not accounted for, explained, or returned to Wilson Arlington all the kickbacks that were received by Hyatt, Rosemont, and other Affiliates from the operation of the Hotel.

## G.   Hyatt's Self-Dealing and Contractual Breaches through Avendra

158.   In October 2000, Hyatt, together with Marriott Corporation formed a new procurement services company, Avendra LLC ("Avendra").

159.   Rosemont, Hyatt's purchasing arm, and Marriott's purchasing companies were merged into Avendra. On information and belief, Avendra was the successor in interest to Rosemont and assumed all of Rosemont's rights and obligations under Rosemont's national and other agreements with vendors. Avendra succeeded to all the kickback arrangements and deals that Hyatt had arranged through Rosemont, and

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

received the payments that would have gone to Rosemont under those preexisting arrangements.

160.   Hyatt also made a separate cash investment in Avendra. Hyatt charged that investment to Chain Expense, thereby spreading the cost of that investment among the owners of Hyatt-managed hotels, including Wilson Arlington.

161.   In exchange, Hyatt received an approximately 18% ownership stake in Avendra. Hyatt executives also serve on Avendra's Board of Managers.

162.   In early 2001, Hyatt entered into a three-year Procurement Services Agreement ("PSA") with Avendra, pursuant to which Hyatt appointed Avendra as the sole purchasing agent for all hotels managed by Hyatt, including the Owner's Hotel.

163.   In the PSA, Hyatt also committed to maximize each Hyatt-managed hotel's purchases through Avendra.

164.   Indeed, Hyatt closely monitored each hotel's Avendra "spend" and actively encouraged the onsite managers at Hyatt-managed hotels, including the Owner's Hotel, to direct as much as possible of their purchasing through Avendra.

165.   Hyatt claimed that Avendra would save the owners of Hyatt-managed hotels money by obtaining greater discounts for the products and services purchased for the operation of the hotels. But Hyatt intentionally failed to provide the hotel owners any way to test those claims.

166.   On information and belief, Hyatt's claims of increased cost-savings through Avendra purchasing are false and misleading because Avendra negotiates

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

1  kickbacks and other consideration for itself from vendors which inflates the prices that

2  the hotels are charged for goods and services purchased through Avendra.

3

4      167.   Hyatt did not disclose the terms of its PSA to the Owner, even while Hyatt

5  had purported to enter into the PSA as the Owner's agent.

6

7      168.   Nor did Hyatt disclose the terms of the agreements between Avendra and

8  the vendors who supplied goods and services to the Hotel, even though Hyatt was privy

9  to the terms of those agreements.

10

11     169.   In 2004, Hyatt entered into another three-year PSA with Avendra on

12  similar terms.

13

14     170.   Avendra was an overnight success for Hyatt. In 2001 alone, Hyatt used

15  Avendra for approximately $122 million in procurement for the hotels that it managed.

16  During the term of the 2001 PSA, the Avendra "spend" of Hyatt-managed hotels

17  exceeded $500 million.

18

19     171.   Avendra received millions of dollars in kickbacks from vendors by virtue

20  of those expenditures. Only a tiny fraction of those kickbacks were returned to the

21  owners of Hyatt-managed hotels. If the kickbacks themselves were not enough,

22  Avendra charged the Hotel its own fees for its purchasing services, which were paid

23  out of the Owner's funds.

24

25     172.   Hyatt meanwhile reaped double-profits from Avendra. Hyatt's ownership

26  stake in Avendra allowed Hyatt to financially benefit directly from Avendra's exploits.

27  Those profits were made at the expense of the Owner, and the owners of other

28  Hyatt-managed hotels.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

173.   Hyatt did not disclose to the Owner the financial rewards it reaped through its investment in Avendra.

174.   Even though Hyatt financed part of its investment on the backs of the hotel owners, by charging the investment as Chain Expense, Hyatt did not give the Owner, or the other hotel owners, their return on that investment. On the contrary, Hyatt charged the Owner an additional fee for expenses that it claimed to have incurred in managing its relationship with Avendra.

175.   Hyatt also received additional compensation directly from Avendra in the form of "sponsorship funds" and "marketing allowances." Hyatt kept those funds as well for its own benefit.

176.   Hyatt's PSAs with Avendra constitute fraud, express breaches of the Management Agreement, and Hyatt's fiduciary obligations to the Owner.

177.   Under the Management Agreement, Hyatt was permitted to appoint only Rosemont as the purchasing agent for the Hotel. The Management Agreement further required Wilson Arlington's written approval for any contracts with any company affiliated with Hyatt.

178.   Even though Avendra was an Affiliate of Hyatt, Hyatt did not seek or obtain Wilson Arlington's written approval of its PSA.

179.   The Management Agreement also required Hyatt to obtain written approval from Wilson Arlington to enter into any contracts with a term longer than one year.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

180.   Both the 2001 PSA and the 2004 PSA, however, had a term of three years.

181.   Hyatt did not seek or obtain Wilson Arlington's written approval for either PSA.

182.   The PSAs also constituted self-dealing by Hyatt because Hyatt had a direct stake in Avendra and because Hyatt's agreement with Avendra provided for payments directly to Hyatt. Both gave Hyatt a strong incentive to funnel as much purchasing as possible for the Hotel through Avendra, regardless of whether the prices that the Hotel was being charged were the lowest prices possible or met the Owner's individual needs and interests. And that is just what Hyatt did.

## H.   Hyatt's Self-Dealing and Fiduciary Breaches through Gold Passport

183.   From 1987 through 2006, Hyatt charged the Owner a fee that it generally referred to as a "Gold Passport" charge. Hyatt told the Owner that the charge related to the expenses incurred by Hyatt in operating a customer loyalty program. Hyatt claims that Gold Passport program members can use hotel stays to earn points that can be redeemed for, among other things, future hotel stays.

184.   For each point earned by a Gold Passport member during a hotel stay, Hyatt charges a fee against the accounts of that hotel that is based on the hotel's "Gold Passport-eligible revenue."

185.   The fee has varied over time. From 1995 through at least December 31, 2006, Hyatt has assessed a fee equivalent to 4% of each hotel's Gold Passport-eligible revenue.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

186.   These fees have yielded incredible amounts of money for Hyatt. Hyatt has collected hundreds of millions of dollars from the accounts of Hyatt-managed hotels under the name of Gold Passport. From the Hotel's accounts alone, Hyatt has collected more than $3 million in Gold Passport fees.

187.   Hyatt claims that the "costs" of the Gold Passport program are paid with Gold Passport fees. Hyatt, however, has never disclosed the amount or nature of those so-called costs. Nor has Hyatt accounted to the Owner for the full amount of the Gold Passport fees or how those fees relate to any benefit or service actually received by the Owner.

188.   Until late 2002, Hyatt even concealed the existence of a fund into which the Gold Passport fees assessed by Hyatt are deposited (the "Gold Passport Fund"). At that time, Hyatt sent the Owner a 200-plus page Annual Business Plan for 2003, in which it stated, for the first time, that "[m]onies collected for Gold Passport are deposited into an interest bearing segregated fund and various investments managed by independent money managers. Actual costs of operating the program, including marketing and award redemptions, are paid from the fund."

189.   Hyatt did not disclose the balance of the Gold Passport Fund,. which stood in excess of $200 million at that time.

190.   Hyatt did not disclose what it considered to be the "actual costs" of the Gold Passport program, or what it charged as such costs to the Gold Passport Fund. Nor did it disclose that Hyatt, in fact, was using the assets of the Gold Passport Fund to pay Hyatt's own general administrative, marketing, and operating costs.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

191.   Hyatt also did not disclose that Hyatt was holding itself out to the auditor as the trustee of the Gold Passport Fund, and representing the Gold Passport Fund as a fund held for the benefit of the Owner and other hotel owners, whose funds had been paid into that fund.

192.   In the same Annual Business Plan, Hyatt stated that the Gold Passport Fund is audited annually by an "independent accounting firm."

193.   Hyatt did not disclose to the Owner that those "audits" were intentionally narrow and limited essentially to confirming Hyatt's arithmetic. In fact, the auditors were not asked to, and did not, review the fairness or propriety of the amounts charged to the Gold Passport Fund by Hyatt as operational costs.

194.   On information and belief, Hyatt was using the Gold Passport Fund to finance Hyatt's own corporate overhead and expenses.

195.   Hyatt also actively misled the auditor about the nature and use of the Gold Passport Fund.

196.   To justify Hyatt's failure to consolidate the activities of the Gold Passport Fund on its financial statements, Hyatt told the auditor reviewing Hyatt's corporate-level financial statements that the Gold Passport Fund was a constructive trust held by Hyatt for the benefit of all the owners of Hyatt-managed hotels and that each owner owned a proportionate share of the Gold Passport Fund.

197.   Hyatt falsely told the auditor that Hyatt's management agreements with all owners expressly provided that the Gold Passport Fund assets would be segregated and that each owner would own a proportionate share of the Gold Passport Fund.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

198.   Hyatt also told the auditor that Hyatt did not need to consolidate the Gold Passport Fund's income on its own balance sheets because the hotel owners to whom the assets in the Gold Passport Fund belonged reported the proportionate share of the fund's value on their own tax returns.

199.   Hyatt also told the auditor that, if the Gold Passport program were discontinued, any excess cash would be returned to the hotels.

200.   Hyatt's representations to the auditor were directly contrary to what it had told and was continuing to tell the Owner. Hyatt told the Owner that the Gold Passport Fund was managed for the benefit of the members of the Gold Passport Program, not the hotel owners.

201.   Hyatt further repeatedly rebuffed Wilson Arlington's efforts to obtain information regarding the operation and funding of the Gold Passport program in order to trick and deceive Plaintiff so that Plaintiff would be prevented from discovering the true facts. Hyatt refused to permit Wilson Arlington access to the auditor whom Hyatt claimed had blessed the Gold Passport fees charged by Hyatt.

202.   When Wilson Arlington sold the Hotel to a third-party, effective December 31, 2006, at least $1.1 million of the funds in the Gold Passport Fund belonged to Wilson Arlington.

203.   Hyatt, however, refused to return those funds to Wilson Arlington or to explain its retention of the funds.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

-41-

COMPLAINT FOR DAMAGES

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1    204.   Hyatt violated the Management Agreement and its fiduciary duties to
2   Wilson Arlington in its assessment and retention of Gold Passport fees, and its
3   management of the Gold Passport Fund.

4

5   **I.    Hyatt's Fiduciary Breaches in Connection with Wilson Arlington's Efforts
6         to Sell the Hotel**

7

8    205.   Beginning in approximately 1999, Wilson Arlington and Hyatt started to
9   discuss a potential renovation of the façade of the Hotel.

10

11    206.   Hyatt commissioned an engineering firm to conduct a façade rehabilitation
12   study. In mid-2004, contractors were solicited for completion of a façade project. The
13   bids ranged from approximately $3 million to approximately $3.7 million for the
14   project. A contractor was selected to complete the project at a cost of approximately
15   $3.35 million.

16

17    207.   In approximately September 2004, Wilson Arlington was told that the
18   façade project would require an application to the Board of Supervisors of Arlington
19   County, Virginia. The application was submitted in or about early 2005.

20

21    208.   In the first half of 2005, Wilson Arlington and Hyatt had a number of
22   discussions with the staff of the Arlington County Board of Supervisors, who indicated
23   that the application was unlikely to be granted with the material that had been
24   proposed. The Arlington County Board of Supervisors' Staff recommended
25   investigating alternative materials, such as granite or metal, to clad the two lower levels
26   of the façade.

27

28

COMPLAINT FOR DAMAGES

1ADA.05

209.   At the same time, Wilson Arlington and Hyatt were discussing extension or renegotiation of the Management Agreement, which was due to expire on December 31, 2006. Hyatt made clear that it was concerned about losing its position managing the Hotel and was also concerned about the prospect of Wilson Arlington selling the Hotel to another owner who may not choose to retain Hyatt as manager of the Hotel.

210.   Representatives of Hyatt and Wilson Arlington met in Chicago in early June 2005 to discuss the terms of an extension and renewal of the Management Agreement. When it became clear that Hyatt's demands were not favorable to the Owner, Wilson Arlington decided that it would offer the Hotel for sale.

211.   Wilson Arlington advised Hyatt that it intended to sell the Hotel, and that it was postponing the façade improvement project indefinitely. Upon learning of Wilson Arlington's decision to postpone the project and to sell the hotel, Hyatt, in September 2005, informed the engineering and construction firms that had been retained for the project that it was terminating its agreements with them due to the indefinite postponement of the project.

212.   In preparing to offer the Hotel for sale to potential buyers in 2005, Wilson Arlington asked Hyatt whether it wanted to have the offering materials include any statement as to whether Hyatt did or did not want to be considered as an operator for the Hotel after its current term expired, and if Hyatt wanted the offering materials to indicate Hyatt's interest in continuing to operate the Hotel, and whether Hyatt also wanted the offering materials to include a statement as to the terms on which Hyatt would offer to operate the Hotel under a future Agreement.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

-43-
COMPLAINT FOR DAMAGES

213.   Hyatt told Wilson Arlington that it did want to be considered as an operator for the Hotel, but it declined to state the terms under which it would agree to operate the Hotel.

214.   Hyatt also asked to receive information about the sales and bidding forms on the basis that it might bid on the Hotel. Wilson Arlington provided Hyatt that information, but Hyatt did not bid on the Hotel.

215.   Wilson Arlington also reminded Hyatt that it had a fiduciary obligation to Wilson Arlington and that Wilson Arlington did not consent to Hyatt attempting to negotiate with potential bidders for the Hotel. Wilson Arlington also advised Hyatt that any prospective buyer would be contractually prohibited from dealing with Hyatt during the sale.

216.   In spite of Hyatt's duties to Wilson Arlington, and contrary to Wilson Arlington's express instructions, Hyatt discussed the potential sale of the Hotel with prospective bidders.

217.   Wilson Arlington did not enter into a contract of sale of the Hotel in 2005.

218.   In 2006, Wilson Arlington offered the Hotel for sale again. In connection with that offering, Wilson Arlington required new potential purchasers to execute a pre-negotiation agreement that specifically provided that the potential purchasers could not use any confidential information disclosed by Wilson Arlington for any purpose involving Hyatt or its Affiliates.

219.   Wilson Arlington excluded Hyatt from participating as a potential purchaser based on its conduct during the 2005 offering. Wilson Arlington also again

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

advised Hyatt not to discuss the potential sale with prospective purchasers and informed Hyatt of the terms of the pre-negotiation agreement restricting bidders' contact with Hyatt.

220.   In violation of Wilson Arlington's express instructions and Hyatt's fiduciary duties, Hyatt nevertheless had contacts with potential buyers in an attempt to secure Hyatt's continued status as the Hotel's manager under any new ownership.

221.   Hyatt employees at the Hotel even monitored and collected information about the activities of the representatives of potential buyers staying at the Hotel. That information—which included such personal information as what and how much a Hotel guest drank while in the Hotel—was reported to Hyatt executives at its corporate headquarters.

222.   Rather than directing the Hyatt employees to refrain from monitoring Hotel guests and prospective buyers in this manner, Hyatt executives utilized that information for Hyatt's own benefit.

223.   In July 2006, while Wilson Arlington was in discussions with prospective buyers of the Hotel, Hyatt delivered to Wilson Arlington a "Ten-Year Capital Plan" for the Hotel, dated June 30, 2006.

224.   Section 7.4(c)(2) of the Management Agreement required Hyatt "in good faith" to prepare and submit on or before November 1st of each year "an annual detailed capital budget," which was to be subject to the Owner's approval.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

225.   Hyatt had never given Wilson Arlington a Ten-Year Capital Plan for the Hotel prior to July 2006. Until then, Hyatt had given Wilson Arlington capital plans for, at most, three years at a time.

226.   Hyatt had given Wilson Arlington a three-year capital plan in November 2005. The three-year capital plan prepared by Hyatt in November 2005 estimated the cost of the façade project at $3,332,125.

227.   The Ten-Year Capital Plan given to Wilson Arlington in July 2006, however, estimated the cost of the façade project at $8,588,037—an increase of more than $5.25 million since the November 2005 capital plan.

228.   Nothing had occurred between November 2005 and July 2006 to increase the anticipated cost of the façade improvement project by more than double the original estimate. In fact, not only had the project been postponed indefinitely in September 2005, but the application before the Arlington County Board of Supervisors was formally withdrawn in May 2006.

229.   When Wilson Arlington expressed its shock and disbelief at Hyatt's new cost projection, Hyatt claimed that the inflated cost of the façade came from an estimate that it had received in June 2005 and had not shared with Wilson Arlington. That estimate was not obtained through the bid process used for the original design. That estimate also was based on an all-metal façade design that had not been presented to or approved by Wilson Arlington and was not required by the Arlington County Board of Supervisors.

230.   Hyatt executives privately acknowledged that the estimate was not realistic and did not reasonably estimate the cost of renovating the Hotel's façade. Hyatt also

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

suggested that Wilson Arlington not disclose the Ten-Year Capital Plan to potential buyers, but it refused to withdraw the Ten-Year Capital Plan.

231.   Wilson Arlington had no choice but to provide the Ten-Year Capital Plan to the prospective buyers.

232.   Hyatt's inflation of the façade improvement project and its Ten-Year Capital Plan dramatically reduced the amounts of the bids that Wilson Arlington received for the Hotel, and also reduced the price at which Wilson Arlington ultimately was able to sell the Hotel.

233.   Hyatt's conduct breached its duties to Wilson Arlington under the Management Agreement, and adversely affected the sale price of the Hotel by approximately $10 million.

## J.   **Hyatt's Improper Retention of Wilson Arlington's Intangible Property**

234.   After the sale of the Hotel closed on December 31, 2006, and Wilson Arlington's relationship with Hyatt was terminated, Hyatt retained for its own use, the personal and commercial information regarding guests of the Hotel that it had collected while managing the Hotel.

235.   That intangible property has independent economic value and belongs to Wilson Arlington because Hyatt collected the information in its capacity as Wilson Arlington's agent, fiduciary, and trustee.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

# FIRST CAUSE OF ACTION

## BREACH OF CONTRACT

**(As Against All Defendants and DOES 1 through 50, inclusive)**

236. Wilson Arlington repeats and realleges each and every allegation contained in paragraphs 1 to 235 of the General Allegations set forth above, as if fully set forth herein.

237. The Management Agreement, including the Amendments, constitutes a binding and enforceable contract between Hyatt and Wilson Arlington.

238. Wilson Arlington has duly performed all conditions, covenants and promises required to be performed by it under the Management Agreement.

239. In clear and material breach of its obligations under the Management Agreement, Hyatt has, among other things:

    (a) engaged in undisclosed self-dealing transactions, including those involving MT Phone, Avendra, and the Gold Passport Fund;

    (b) retained and failed to disclose, account for, and remit to the Owner all monies and other consideration given to Hyatt, Rosemont, Avendra, and other Hyatt Affiliates by vendors who supplied goods or services to the Hotel;

    (c) improperly charged the Owner for Hyatt's corporate overhead and overhead costs of Affiliates of Hyatt;

    (d) improperly charged the Owner for expenses incurred in connection with Hyatt-managed hotels located outside the United States;

    (e) furnished false financial statements for the Hotel to the Owner;

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

(f)   failed to properly account for the fees, allowances, charges, commissions, bonuses, discounts, rebates, profits and/or kickbacks paid to Hyatt, Rosemont, Avendra, and other Hyatt Affiliates by virtue of its management of the Hotel;

(g)   failed to account to the Owner for the Management Fees, Gold Passport fees, and Chain Expenses charged to the accounts of the Hotel;

(h)   provided false, inconsistent and misleading information to the auditors of the Hotel's books and records;

(i)   provided false, inconsistent, and misleading information to the Owner;

(j)   failed to manage the Gold Passport Fund for the benefit of the Owner, to properly account to the Owner for the assets in the Gold Passport Fund, or to return to the Owner its proportionate share of the Gold Passport Fund;

(k)   grossly and improperly inflated the projected cost of improving the Hotel's façade, thereby reducing the sale price of the Hotel; and

(1)   failing to return to Wilson Arlington all of the intangible property, including customer information, that was created and collected by Hyatt in its capacity as Wilson Arlington's agent, fiduciary, and trustee.

240.   At all times, Hyatt's conduct was intended to deceive or trick the Plaintiff from discovering the true facts and said conduct did in fact prevent Plaintiff from discovering the truth until on or about June 11, 2008 and more so in June 2009 and thereafter (as a result of the Court's Order attached hereto as Exhibit 2) which disclosed documents which contained the true facts giving rise to this cause of action.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

241.   Wilson Arlington has suffered damages as a direct result of Hyatt's breaches of its obligations under the Management Agreement.

## SECOND CAUSE OF ACTION

### FRAUD/CONCEALMENT

**(As Against All Defendants and DOES 1 through 50, inclusive)**

242.   Plaintiff hereby incorporates by reference, as though fully set forth at length in this cause of action, each and every paragraph stated above.

243.   Hyatt, by and through its agents, employees and representatives including Chuck Floyd, Vice President of Operations, made the representations alleged in paragraphs 56, 57, 60, 61, 62, 63, 67, 69, 78, 79, 80, 87, 95, 98, 99, 102, 108, 113, 116, 117, 118, 121, 123, 124, 125, 127, 142, 143, 146, 148, 150, 153, 165, 187, 192, 196, 197, 198, 199, 200, to the Plaintiff.

244.   These representations were in fact false.

245.   When defendants made the representations, defendants knew they were false.

246.   Defendants made the representations with the intent to defraud the Plaintiff for the purpose of receiving compensation and remuneration to which it was not entitled and/or to trick and deceive the Plaintiff so that Plaintiff would not discover the true facts.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

247.   At the time plaintiff acted, plaintiff did not know the representations were false and believed they were true.  Plaintiff acted in justifiable reliance upon the truth of the representations.

248.   Defendants concealed or suppressed material facts, such that defendants never intended to perform in accordance with the Management Agreement attached hereto as Exhibit 1.  The concealed facts are set forth in paragraphs 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 58, 59, 65, 66, 70, 75, 76, 77, 78, 79, 84, 92, 93, 94, 96, 119, 120, 126, 142, 144, 146, 152, 153, 167, 168, 173, 188, 189, 190, 191, and 193 herein. Plaintiff did not learn of the falsity of Defendants' representations until on or about June 11, 2008 and again after June 2009 when Hyatt was sanctioned $100,000.00 and ordered to produce documents it either failed to produce or to disclose their existence (*see*, Exh. 2).

249.   Defendants concealed or suppressed material facts that defendants were bound to disclose.

250.   Defendants concealed or suppressed material facts by telling Plaintiff untruths to mislead Plaintiff and prevent Plaintiff from discovering the concealed or suppressed facts and documents.

251.   At the time Plaintiff acted, Plaintiff was unaware of the concealed or suppressed facts and would not have continued to do business with Hyatt if Plaintiff had known the true facts.

252.   In justifiable reliance upon Defendant's conduct, Plaintiff continued to do business with Hyatt under the terms and conditions of the Management Agreement attached hereto as Exhibit 1.

1   253.   Because of plaintiff's reliance upon defendants' conduct, plaintiff has and

2   incurred substantial damages in an amount to be determined.

3

4   ### THIRD CAUSE OF ACTION

5   **BREACH OF FIDUCIARY DUTY**

6   **(As Against All Defendants and DOES 1 through 50, inclusive)**

7

8   254.   Plaintiff hereby incorporates by reference, as though fully set forth at

9   length in this cause of action, each and every paragraph stated above.

10

11   255.   By virtue of entry into the Management Agreement attached as Exhibit 1,

12   Defendants in their capacity as hotel operators, owed Plaintiff a duty of utmost loyalty

13   and fidelity, including without limitation a duty of fair, open and honest disclosure and

14   a duty of care not to engage in acts of self-dealing, fraud, or in any other action which

15   would cause injury to the Plaintiff.

16

17   256.   Defendants breached their fiduciary duty which they owed to plaintiff

18   through their deceitful, manipulative acts in connection with the parties' agreement.

19   Defendants breached their fiduciary duties by engaging in acts of fraud, self-dealing

20   and bad faith.

21

22   257.   Plaintiff at all times demonstrated the highest degree of loyalty in its

23   dealings with Defendants.   However, Defendants, secretly plotted to deceive the

24   Plaintiff and failed to measure up to the standard of conduct set by Plaintiff.

25   Defendants undermined the food faith which Plaintiff put in them and breached their

26   fiduciary duties."

27

28

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

258." By reason of the breach by Defendants, Plaintiff was caused to and did suffer and sustain special and general damages according to proof, for which sum Plaintiff seek judgment in this action.

259.   Because the acts and/or omissions of Defendants as set forth herein were either committed by such Defendants directly or authorized, ratified, or otherwise approved by officers, directors, and/or managing agents of the aforementioned defendants, and carried out in a deliberate, cold, callous, intentional, and/or unreasonable manner, causing injury and damage to Plaintiff, and done with a conscious disregard of Plaintiff's rights, Plaintiff requests the assessment of punitive damages against Defendants, in an amount appropriate to punish or set an example of said Defendants.

## FOURTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION
**(As Against All Defendants and DOES 1 through 50, inclusive)**

260.   Plaintiff incorporates by reference, as though fully set forth at length in this cause of action, each and every paragraph stated above.

261.   Defendants' misrepresentations included, but were not limited to, those actions and statements described in paragraphs 56, 57, 60, 61, 62, 63, 67, 69, 78, 79, 80, 87, 95, 98, 99, 102, 108, 113, 116, 117, 118, 121, 123, 124, 125, 127, 142, 143, 146, 148, 150, 153, 165, 187, 192, 196, 197, 198, 199, 200, herein.

262.   Defendants misrepresented these facts to Plaintiff without having reasonable grounds for believing said facts to be true.

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

263.   At the time Plaintiff acted, it was unaware of the misrepresented facts, and it would not have acted as it did if it had known such facts.

264.   Plaintiff's reliance upon Defendants' representations was reasonable because Defendants had an established reputation in the industry and Plaintiff had no grounds to believe the representations were false at the time they were made.

265.   As a result of its reliance upon Defendants' representations, Plaintiff was induced to continue to do business with Hyatt under the terms of the Management Agreement.

266.   By reason of the representations of Defendants, Plaintiff was caused to and did suffer and sustain special and general damages according to proof, pursuant to section 425.10 of the California Code of Civil Procedure, for which sum Plaintiff seeks judgment in this action.

267.   Because the representations of Defendants were either committed by such Defendants directly, or authorized, ratified, or otherwise approved by officers, directors, and/or managing agents of the aforementioned Defendants, and carried out in a deliberate, cold, callous, intentional, and/or unreasonable manner, causing injury and damage to Plaintiff, and done with a conscious disregard of Plaintiff's rights, Plaintiff requests the assessment of punitive damages against Defendants, in an amount appropriate to punish or set an example of said Defendants.

/ / /
/ / /
/ / /
/ / /
/ / /

1ADA.05

# FIFTH CAUSE OF ACTION

## ACCOUNTING

### (As Against All Defendants and DOES 1 through 50, inclusive)

268.   Plaintiff incorporates herein all of the allegations and statements contained in paragraphs 1 though 267, inclusive.

269.   The total amount of money earned by defendants, and each of them, as a result of their wrongful conduct is unknown to Plaintiff at this time and cannot be ascertained without an accounting of the records of Defendants and Does 1 through 50, inclusive, and each of them.

270.   An accounting is the only means by which the exact amounts that were improperly taken from the Hotel's trust accounts and the Gold Passport trust funds and given to Hyatt and/or its Affiliates can be determined.  An accounting is also the sole means by which to evaluate the validity and fairness of the transactions effected by Hyatt against the Hotel's trust accounts and the Gold Passport trust fund.

271.   Wilson Arlington is entitled to and hereby seeks a full accounting of the Hotel's operating accounts, the Gold Passport trust fund and all other accounts operated and/or controlled by Hyatt, including all revenues and expenses deposited into and paid out of those trusts.  Wilson Arlington further seeks disgorgement and restitution of all Management Fees and other fees, charges, rebates, allowance, kickbacks, and other payments received by Hyatt by virtue of operation of the Hotel from 1985 to 2006, for which Hyatt cannot fully account.

/ / /

/ / /

/ / /

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

# **PRAYER FOR RELIEF**

WHEREFORE, Wilson Arlington Company prays as follows:

    (a)   Finding that Hyatt has materially breached the Management Agreement governing the relationship between the parties;

    (b)   Ordering Hyatt to account for the Management Fees, Gold Passport Fees, and Chain Expenses charged to the accounts of the Hotel or Wilson Arlington;

    (c)   Ordering Hyatt to account for all monies paid by the Owner into the Gold Passport Fund since 1987;

    (d)   Ordering Hyatt to disgorge all Management Fees, Gold Passport Fees, and Allocable Chain Expenses charged to the accounts of the Hotel or Wilson Arlington;

    (e)   Ordering Hyatt to disgorge all profits and other consideration received or retained in undisclosed Affiliate transactions conducted on behalf of the Hotel or Wilson Arlington;

    (f)   Ordering Hyatt to disgorge all undisclosed profits and other consideration received or retained by Hyatt through its transactions with other third parties on behalf the Hotel or Wilson Arlington;

    (g)   Ordering Hyatt to account for all monies received by Avendra, Rosemont, or any other Hyatt Affiliate on account of transactions conducted on behalf of the Hotel or Wilson Arlington;

    (h)   Ordering Hyatt to account for, return, disclose any sale, license, or third-party use authorized by Hyatt of, and cease use of, all of the intangible property, including customer information, that was created and collected by Hyatt in its capacity as Wilson Arlington's agent, fiduciary, and trustee.

/ / /

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1       (i)   Awarding Wilson Arlington monetary damages in the amount of $45

2            million;

3       (j)   Awarding to Wilson Arlington its attorneys' fees, costs and expenses

4            related to this action;

5       (k)   An accounting of Defendants' books and records relative to

6            Defendants' operation of the Hotel;

7       (l)   Punitive damages; and

8       (m)  Awarding to Wilson Arlington such further relief as the Court deems

9            just and proper.

10

11   DATED: May 5, 2010         GREENE BROILLET & WHEELER, LLP

12

13                          Bruce A. Broillet, Esq.

14                          Mark T. Quigley, Esq.

                          Scott H. Carr, Esq.

15                          Attorneys for Plaintiff

16                          WILSON ARLINGTON COMPANY

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES

1ADA.05

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

DATED:  May 5, 2010                    GREENE BROILLET & WHEELER, LLP

                                       _____
                                       Bruce A. Broillet, Esq.
                                       Mark T. Quigley, Esq.
                                       Scott H. Carr, Esq.
                                       Attorneys for Plaintiff
                                       WILSON ARLINGTON COMPANY

GREENE BROILLET & WHEELER, LLP
P.O. BOX 2131
SANTA MONICA, CA 90407-2131

1ADA.05

-58-
COMPLAINT FOR DAMAGES

1

MANAGEMENT AGREEMENT

between

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,

a New Jersey corporation

and

HYATT CORPORATION,

a Delaware corporation

P30003124

## TABLE OF CONTENTS

| Section | Title | Page |
|---|---|---|
| | Recitals | 1 |
| 1 | Certain Terms Defined | 2 |
| 2 | Term | 3 |
| 3 | Use and Operation of the Hotel | 3 |
| 3.1 | Use and Standard of Operation | 3 |
| 3.2 | Leases and Concessions | 8 |
| 3.3 | Bank Accounts | 9 |
| 3.4 | Expenditures | 10 |
| 4 | Management Fees and Remittances to Owner | 12 |
| 4.1 | Definitions | 12 |
| 4.2 | Hyatt's Management Fee | 14 |
| 4.2.1 | Annual Management Fee | 14 |
| 4.2.2 | Time and Manner of Payment | 15 |
| 4.3 | Remittances to Owner | 16 |
| 4.4 | Supplemental Payment | 17 |
| 4.5 | Performance Test | 17 |
| 5 | Replacement of Furnishings and Equipment | 18 |
| 5.1 | Furnishings and Equipment Reserve Account | 18 |
| 5.2 | Labeling of Items Purchased | 20 |
| 5.3 | Liens | 20 |
| 6 | Repairs and Changes; Legal Requirements | 20 |
| 6.1 | Repairs and Maintenance | 20 |
| 6.2 | Alterations and Additions | 21 |
| 6.3 | Owner's Additions | 21 |
| 6.4 | Required Changes | 22 |
| 7 | General Covenants of Hyatt and Owner | 23 |
| 7.1 | Working Capital | 23 |
| 7.2 | Chain Services | 24 |
| 7.3 | Right of Inspection and Review | 26 |
| 7.4 | Financial Reports and Audit | 26 |
| 7.5 | Payment of Taxes | 29 |
| 7.6 | Indemnification by Hyatt | 30 |
| 7.7 | Indemnification of Hyatt | 30 |
| 8 | Insurance | 31 |
| 9 | Damage to and Destruction of Hotel | 36 |
| 9.1 | Owner's Duty of Restoration | 36 |
| 9.2 | Owner's Election Not to Restore | 37 |
| 10 | Condemnation | 37 |
| 11 | Events of Default; Termination Rights | 39 |
| 11.1 | Events of Default | 39 |
| 12 | Trade Name | 41 |
| 13 | Successors and Assigns | 42 |
| 13.1 | Assignment by Hyatt | 42 |
| 13.2 | Assignment by Owner | 44 |
| 13.3 | Effect of Assignment | 45 |
| 14 | Notices | 45 |
| 15 | Applicable Law | 46 |

P30003125

## MANAGEMENT AGREEMENT

THIS AGREEMENT, made and dated this 19th day of February, 1980, by and between THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation (hereinafter called "Owner" or "Prudential") and HYATT CORPORATION, a Delaware corporation (hereinafter called "Hyatt").

### RECITALS

WHEREAS, Owner has acquired the Tenant interest and is the Tenant of that certain real property located in Arlington County, Virginia (hereinafter called "Site"), and more particularly described in Exhibit A attached hereto and made a part hereof, pursuant to that certain Agreement of Lease, dated June 1, 1973, between MURPHY & AMES, INC. (hereinafter called "M & A") as Landlord and R-V DEVELOPMENT COMPANY (hereinafter called "R-V") as Tenant, as amended by First, Second and Third Amendments to Agreement of Lease, dated September 9, 1975, April 1, 1976, and June 30, 1976, respectively, and executed by M & A and R-V (the said Agreement of Lease as so amended hereinafter called the "Ground Lease"); and

WHEREAS, Owner has purchased the hotel building containing no fewer than 300 rooms (hereinafter called the "Building") and has caused the Building to be completed in accordance with plans and specifications heretofore approved by Hyatt, and has caused to be purchased and installed in and about the Building the following personal property, plans and specifications for which Hyatt has approved:  Furnishings and Equipment, consisting of furniture and furnishings and

P30003126

hotel equipment ("Furnishings and Equipment"), and operating equipment, consisting of uniforms, tools, and utensils and china, glassware, linens, silverware and the like ("Operating Equipment") (all of the foregoing hereinafter called "FFE"); and

WHEREAS, Owner desires to have the aforesaid hotel managed by Hyatt for the account of the Owner and Hyatt desires to undertake management of the aforesaid hotel for the account of the Owner.

NOW, THEREFORE, the Owner and Hyatt do enter into this Agreement and mutually agree to the following terms and conditions:

Section 1.          Certain Terms Defined.

(a)   "Capital Improvements" for purposes of this Agreement refer to any alterations, additions, or improvements in or to the Improvements or rebuilding or renovation of the Building, the cost of which is neither charged to repairs and maintenance, nor provided in Sections 5.1(b)(iii), 6.1, 6.4, 9.1 and 10.5.

(b)   "Ground Rent" for purposes of this Agreement refers to the rent, including minimum or fixed rent and percentage rent, payable under Article 3 of the Ground Lease, exclusive of any other charges payable by the Tenant under the Ground Lease.

(c)   "Hotel" for purposes of this Agreement refers to the Real Property and the FFE.

(d)   "Improvements" for purposes of this Agreement refers to the Real Property and related improvements

- 2 -

Exhibit 1; Page 61

thereto.

    (e)  "Real Property" for purposes of
this Agreement refers to the Site and the Building.

### Section 2.     Term.

  2.1    The term of this Agreement (hereinafter
called "Term") shall commence on January 1, 1980 and shall
terminate on December 31st of the thirtieth (30th) fiscal
year from the December 31st of the year of the Opening Date,
unless this Agreement shall be sooner terminated in accordance
with its terms.

  2.2    In addition to any other right of termination
under this Agreement, Owner shall have the right to terminate
this Agreement without cause by giving to Hyatt a notice
specifying the date of termination, which shall be not
earlier than nine (9) months from the first day of the month
next succeeding the date of the notice of termination sent
by the Owner.  In the event that Owner elects to terminate
this Agreement as provided in Section 2.2, Owner shall pay
to Hyatt on or before the specified date of termination a
termination fee equal to three (3) times the Annual Management
Fee (as defined in Section 4.2.1 hereof) paid to Hyatt in
respect of the full fiscal year immediately preceding the
date on which notice of termination was given.

### Section 3.     Use and Operation of the Hotel.

  3.1    Use and Standard of Operation.

    (a)  Owner hereby agrees that Hyatt
shall manage and operate the Hotel in accordance with the
terms of this Agreement, and Hyatt hereby agrees to manage

- 3 -

P30003128

and operate the Hotel in accordance with the terms of this
Agreement.  Without limiting the generality of the foregoing,
such management and operation of the Hotel by Hyatt shall
include and extend to, among others, the operation of the
Hotel for all activities which are customary and usual to a
hotel business; the charges to be made for rooms and commercial
space other than space leased to concessionaires, for entertainment
and amusement, and for food and beverages; the labor policies
of the Hotel (including wage rates, the hiring and discharging
of employees, and the installation of employee retirement
and other benefit plans, all subject to Section 3.1(c),
below); and all phases of promotion and publicity.  Hyatt is
hereby authorized to negotiate and enter into such reasonable
contracts as agent for Owner as may be necessary or advisable
in connection with operation of the Hotel, subject to Owner's
written approval of (1) contracts having a term of greater
than one year, including renewals, or are not terminable
within one year from the date of their execution without
cause, cost or penalty; (2) any contract or series of related
contracts which in the aggregate bind Owner to aggregate
payments exceeding Ten Thousand Dollars ($10,000.00) except
for contracts for sales of food, beverages, or rooms; and
(3) contracts with a corporation or a person or persons
controlling, controlled by, under common control of, or
affiliated with Hyatt; provided, however, that, subject to
the provisions of Section 5.1(b)(ii), Hyatt shall have the
right to contract with, or otherwise appoint its affiliate,
Rosemont Purchasing Company ("Rosemont"), to act as purchasing
agent for the Hotel and to pay Rosemont a fee or fees for
its services so long as such fee or fees are no greater than

- 4 -

P30003129

those charged by Rosemont for comparable services performed
for unaffiliated third parties. None of the contracts negotiated
and entered pursuant to the authority granted by this subsection
shall contain provisions making them automatically renewable.
Hyatt shall make available at the Hotel at all times to
Owner executed counterparts or certified true copies of all
contracts it enters pursuant to this Section 3.1(a), including,
but not limited to, those for equipment leasing and for
maintenance.  Should Hyatt receive notice of any lien,
encumbrance or charge upon the Real Property arising out of
any contract entered by Hyatt as aforesaid, Hyatt immediately
shall give Owner notice of the same with a photocopy of the
notice and all supporting documents received by Hyatt.
Hyatt shall use its best efforts to take whatever action
with Owner's approval is necessary to remove the lien,
encumbrance or charge, provided, however, that this obligation
on Hyatt shall not be deemed to require Hyatt to expend
funds except on behalf of Owner.

        (b)  Except as elsewhere herein limited
or excused, Hyatt shall, throughout the Term, comply with
all applicable requirements (hereinafter called the "Legal
Requirements") under all laws, statutes, ordinances, orders,
rules and regulations of governmental authorities having
jurisdiction over the Hotel and Hyatt shall defend any
actions, suits or proceedings alleging non-compliance in
accordance with the provisions of this subparagraph.  Hyatt
may, but only after approval by Owner, contest, by appropriate
legal proceedings conducted in good faith, in the name of
Hyatt or Owner, or both, the validity or application of any
Legal Requirements.  If Hyatt shall pursue any such contest

- 5 -

in the name of Owner, Owner shall approve the attorney or
law firm to be employed prior to initiating such contest.
If Owner shall approve any such contest, Owner at its discretion
shall execute and deliver any appropriate documents which
may be necessary or proper to permit Hyatt to prosecute such
contest.  Owner may, by notice to Hyatt, direct Hyatt to
contest, or Owner may contest directly, any Legal Requirements
which Hyatt may otherwise desire not to contest.

      (c)  All employees of the Hotel
shall be the employees of Hyatt and at the end of each payroll
period, Hyatt may reimburse itself out of the operating
accounts, as hereinafter defined, for their total aggregate
compensation, including fringe benefits.

      The term "fringe benefits"
includes, without limitation, bonuses, pension or profit
sharing plan contributions, incentive compensation, workmen's
compensation insurance, group life and accident and health
insurance premiums and similar benefits available to such
employees by virtue of their employment by Hyatt. . All "fringe
benefits" shall be in conformity with Hyatt corporate
plans; shall be equal in all respects to those for employees
of other hotels operated by Hyatt; shall, as the "fringe
benefits" effect this Hotel, be allocated to this Hotel;
and, as they apply to this Hotel, shall be subject to audit
by the Owner.  Hyatt will provide Owner with a schedule
showing details of all fringe benefit plans in effect as of
the date of this Agreement.  Owner shall be advised not less
than sixty (60) days prior to institution of any fringe
benefits subsequent to the date of this Agreement for personnel
employed at the Hotel.  All non-scheduled perquisites to

- 6 -

P30003131

Hyatt employees payable out of the operating accounts shall be subject to Owner's approval.

Hyatt shall provide a schedule of compensation for the executive staff of the Hotel indicating the salary range and perquisites for each position. The annual executive bonus budget (as a part of the annual budget) for the Hotel shall be subject to Owner's approval. In the event an employee is hired by the Hotel or transferred to the Hotel, and then transferred from the Hotel by Hyatt before completing one full year of service at the Hotel, then the hiring, education, transportation, or relocation expenses for such an employee which have been charged against the Hotel's operations shall be reimbursed to the Hotel by Hyatt.

Prior to making a change of the General Manager of the Hotel, Hyatt shall inform Owner's Vice President, Hotel Investments, of the proposed change.

The expenses of travel by Hyatt corporate personnel in connection with the Hotel shall be borne by Hyatt and not charged as operational expense to the Hotel.

In the event, and whenever, Hyatt shall be subject to any tax, irrespective of its designation (including a fee, charge or other imposition for the issuance of a license, permit or the privilege to conduct a business or occupation), imposed, levied, or assessed by the United States, the State of Virginia, the County of Arlington, or any municipality or by any subdivision or agency of the foregoing, which tax is measured by reimbursements for wages and salaries and any fringe benefits as aforesaid paid to or

- 7 -

P30003132

Exhibit 1; Page 66

in respect of employees who are directly employed at the
Hotel for the sole purpose of operation of the Hotel, then,
and in any such event, Owner will indemnify and hold Hyatt
harmless from and against any liability for such tax or
taxes, it being expressly understood that taxes paid and
collected under the Federal Insurance Contributions Act and
under the Federal Unemployment Tax Act and corresponding
state taxes shall not be included within the foregoing
indemnification.  At Owner's request, Hyatt will resist, by
appropriate proceedings, any liability for any tax included
in this Section 3.1 (d), in which case costs and expenses
(including, without limitation, attorney's fees) incurred by
Hyatt in resisting or defending itself against such liability
shall be charged as an operating expense of the Hotel.

        (d)  Subject to the availability of
funds, Hyatt agrees to exercise its obligations under this
Agreement in such a manner as not to violate Owner's obligations
under the Ground Lease and Hyatt will not suffer or permit a
default to arise under the Ground Lease by reason of its
failure to satisfy any of Owner's obligations contained
therein, it being expressly understood that Hyatt has no
obligation to make the rent or any other payments under the
Ground Lease.  Hyatt acknowledges receipt of the Ground
Lease and Owner will provide Hyatt with copies of any amendments
to the Ground Lease executed subsequent to the date of this
Agreement.

3.2        <u>Leases and Concessions</u>.

        (a)  Hyatt shall operate and provide in the
Hotel all facilities and services except for such concessionaire
operations as may be mutually agreed upon by Hyatt and Owner

- 8 -

normally operated or provided directly by managers or operators of hotels of comparable class and standing and shall not lease the Hotel or any portion thereof or grant concessions in respect of such services or facilities without the approval of Owner.  Any such lease or concession shall be approved by Owner and shall be entered into in Owner's name and shall be executed by Owner.  Any such lease shall be subordinate to the Ground Lease and will contain those provisions required by Article 19 of the Ground Lease.

(b)  Hyatt shall, during the Term, use reasonable efforts to perform all of the obligations of Owner as Landlord or concessionaire under all present or future leases and concessions made or granted with respect to the Hotel, such performance being subject to the approval of the Owner.

(c)  Hyatt shall collect all rents and other sums falling due during the Term under any present or future leases or concessions, and shall deposit the same in the operating accounts.  Hyatt recognizes and agrees that rents from any such leases have been assigned by Owner to the Ground Lease Landlord in the event of Owner's default thereunder for payment of the ground rent due.  Hyatt further recognizes and agrees that advanced rents under such leases cannot be collected except for the first month's rent in the due course of business and in good faith for up to four months in advance of the date due and payable, and for amounts obtained for reasonable security.

3.3        Bank Accounts.

There shall be deposited in a bank or banks designated by Owner, in accounts established in the

- 9 -

P30003134

Exhibit 1; Page 68

name of "Arlington Hyatt-Rep Account" with written instructions
to the bank or banks in which the accounts are located that
the funds therein are held in trust for Owner, all moneys
advanced to the Hotel as working capital by Owner, as provided
in Section 7.1 hereof, and all moneys received by Hyatt from
the operations of the Hotel (these accounts herein called
"operating accounts"). Hyatt shall pay out of the operating
accounts, to the extent of the funds from time to time
therein and available to Hyatt, all costs and expenses
incurred in connection with the operation of the Hotel, as
set forth in Section 3.4, below. Checks or other documents
of withdrawal drawn upon the operating accounts shall be
signed by representatives of Hyatt or Hotel employees designated
by Hyatt, which persons drawing on such accounts shall be
bonded or otherwise insured. Through the use of signature
cards, authorized representatives of the Owner shall be
permitted access to any and all funds in the bank accounts
described in this Section 3.3, and Sections 5.1 and 7.1.
Hyatt's authority to draw against such accounts may be
terminated at any time by Owner without notice to Hyatt. If
Hyatt's authority to draw against such accounts is so
terminated, Owner shall leave in these accounts sufficient
funds to cover those checks known to be outstanding as of
the date of the takeover.

    3.4               Expenditures.

                 To the extent of funds from time
to time in the operating accounts, (or, if appropriate, from
house banks or petty cash funds available at the Hotel),
Hyatt is hereby authorized to pay such amounts and at such
times as are required in connection with the maintenance and

- 10 -

P30003135

Exhibit 1; Page 69

operation of the Hotel and related facilities, including without limitation the following:

(a) making all repairs, decorations, revisions, alterations and improvements to the Hotel as shall be reasonably necessary for the proper maintenance thereof in good order, condition and repair to correct normal fair wear and tear, subject to the applicable approved budgets, set forth in Section 7.4(c), however, not to include any replacements of furniture, fixture and equipment or any other capital expenditures;

(b) purchasing such operating supplies as shall be reasonably necessary for the proper operation of the Hotel;

(c) applying for, obtaining and maintaining all licenses and permits, except for liquor licenses, required of the Owner or Hyatt in connection with the operation and management of the Hotel; Owner agrees to execute and deliver any and all applications and other documents as shall be reasonably required and to otherwise cooperate, in all reasonable respects, with Hyatt in applying for, obtaining and maintaining such licenses and permits;

(d) making all other reimbursements and other amounts due to Hyatt and its affiliates under any of the provisions of this Agreement; but in any event subject and pursuant to all the terms and provisions of this Agreement.

Hyatt agrees that any services rendered by or merchandise purchased from any third person or from Hyatt or any of its affiliates shall at all times be fully competitive with the prices available from third parties.

- 11 -

Section 4.        Management Fees and Remittances to Owner.

   4.1        Definitions.

   (a)  A "fiscal year" hereunder shall mean a period of twelve (12) consecutive months included in the Term and ending on December 31st and, in the event that there shall be an early termination of the Term on a date other than December 31st, the last fiscal year hereunder shall end on the date of such early termination and shall commence on the preceding January 1st.

   (b)  A "short fiscal year" shall be a fiscal year comprising less than twelve (12) full calendar months.

   (c)  The "Cumulative Period" in respect of any month included in a fiscal year shall mean the period commencing on the first day of such fiscal year and ending on the last day of such calendar month.  The Gross Operating Profit for any Cumulative Period shall mean the sum of the amounts of Gross Operating Profit for each calendar month included in such Cumulative Period, such sum to be determined after taking into account any deficit in Gross Operating Profit for any such calendar month.

   (d)  The "Gross Operating Profit" shall be defined as the Gross Operating Profit shown on a copy of page 12 of the Uniform System of Account for Hotels, Sixth Revised Edition (hereinafter called the "Current Uniform System"), without regard to supplements or additions thereto hereafter adopted, showing the items of income and expense which are taken into account in determining "Gross Operating Profit", attached hereto as Exhibit B (but without taking into account any deduction for the Annual Management Fee, as

- 12 -

P30003137

hereinafter defined);

(e)   The "Adjusted Profit" for any period shall mean the Gross Operating Profit for such period less the sum of the following (but only to the extent such items are not otherwise deducted under the Current Uniform System in computing Gross Operating Profit):

(1)   The Basic Fee for such period payable pursuant to Section 4.2.1 if such period be a fiscal year or, if such period be less than a fiscal year, the aggregate amount of the tentative monthly installments on account of the Basic Fee payable for such period pursuant to Section 4.2.2(a); and

(2)   An amount equal to ten percent (10%) of the total cost of the Hotel to Owner (hereinafter called "Project Cost") determined in accordance with generally accepted principles of accounting.  The Project Cost as of any date during the Term shall be an Initial Project Cost of $14,601,704.76 plus any additions to Project Cost provided for in Sections 5.1(b)(iii), 6.3, 6.4, 9.1, and 10.5 hereof incurred prior to such date.

(3)   An amount equal to the aggregate deductions for such period made under Section 5.1 as if Reserve Account established thereunder were funded, without regard to whether or not the said Reserve Account is actually funded at any time during such period;

(4)   Premiums on insurance maintained — in accordance with Section 8 and properly allocable to such period;

(5)   All real and personal property taxes referred to in Section 7.5 and all other taxes (other than income taxes) arising out of the Hotel operation and properly allocable to such period;

(6)   All costs and expenses incurred — during such period in respect of items described in Section 6.1;

(7)   Ground Rent properly allocable to such period;

(8)   The amount of proceeds from any sale of Furnishings and Equipment and Operating Equipment during such period;

(9)   All other reasonable costs and expenses incurred during such period in the operation of the Hotel and all other amounts deductible in respect

- 13 -

P30003138

Exhibit 1; Page 72

of such period under the terms of this Agreement.

(f)  The "Fixed Basic Fee" for a full fiscal year shall be $100,000.00.  The "Fixed Basic Fee" for a short fiscal year shall be $100,000.00 multiplied by a fraction (the "Partial Year Fraction") of which the denominator is twelve (12) and the numerator is the number of months contained in such fiscal year (and for the purpose of computing such Partial Year Fraction, a partial month shall be expressed as a fraction, hereinafter referred to as the "Partial Month Fraction" for such partial month, of which the denominator is thirty (30) and the numerator is the number of days included in such partial month).  The "Fixed Monthly Installment" on account of the Fixed Basic Fee shall mean $8,333.33 for a full calendar month; for a partial month the Fixed Monthly Installment shall be $8,333.33 multiplied by the Partial Month Fraction for such partial month.

4.2        <u>Hyatt's Management Fee</u>.
4.2.1      <u>Annual Management Fee</u>.

For each fiscal year Hyatt shall receive, in respect of its management services hereunder, an amount (hereinafter called the "Annual Management Fee") equal to the sum of the Basic Fee and Incentive Fee, as provided in the ensuing clauses (a) and (b):

(a)  Hyatt shall receive a Basic Fee equal to the Fixed Basic Fee for such fiscal year or ten percent (10%) of the Gross Operating Profit for such fiscal year whichever shall be the greater.

(b)  For any such fiscal year for which there is an Adjusted Profit, Hyatt shall receive, in addition

- 14 -

to the Basic Fee, an Incentive Fee equal to twenty percent (20%) of the Adjusted Profit for such fiscal year.

    4.2.2        <u>Time and Manner of Payment</u>.

        (a)  With respect to any fiscal year and each calendar month, the Basic Fee shall each be payable in tentative monthly installments in the amount provided in clause (b) immediately following.  The tentative monthly installments on account of such Basic Fee shall be paid to Hyatt twenty (20) days after Owner has received the financial statement for such calendar month submitted by Hyatt pursuant to Section 7.4 hereof by a check in the amount of the tentative monthly installments issued to Hyatt by Owner's Capital Real Estate Investment Office, or its successor in responsibility (hereinafter called "RBIO").

        (b)  With respect to each calendar month included in any such fiscal year, the tentative monthly installment on account of the Basic Fee for any such calendar month shall equal (i) an amount determined by multiplying $8,333.33 by the number of months included in the Cumulative Period in respect of such month or ten percent (10%) of the Gross Operating Profit for such Cumulative Period, whichever is greater, less (ii) the aggregate amount of the tentative monthly installments having theretofore become payable for such fiscal year on account of such Basic Fee.

        (c)  The Incentive Fee described in Section 4.2.1(b) shall be paid annually upon submission by Hyatt to Owner the Financial Statement for last month of the fiscal year pursuant to Section 7.4 hereof.

        (d)  If, for any such fiscal year, the aggregate amount of the tentative monthly installments paid

- 15 -

to Hyatt on account of the Basic Fee and the annual Incentive Fee shall be more or less than the Annual Management Fee payable for such fiscal year based upon the final determination of the Gross Operating Profit and Adjusted Profit for such fiscal year as reflected in the Financial Statement for the last month of fiscal year pursuant to Section 7.4 hereof, then, by way of yearend adjustment within fifteen (15) days after the delivery of such Financial Statement to Owner, Hyatt shall pay to Owner at its REIO the amount of any such overpayment or shall receive from the Owner's REIO a check in the amount of any such underpayment. However, Owner reserves the right to audit the Financial Statement and the parties hereto shall adjust payments made and received by and between them as may be required upon completion of the Owner's audit.  Disputes arising under this Section 4.2.2 shall be resolved by an independent Certified Public Account selected by Owner, whose findings shall be conclusive and whose fees for services rendered in resolving the dispute shall be paid by the party against whom the independent accountant finds, provided that variance is in excess of five (5%) percent.

    4.3                <u>Remittances to Owner</u>.

                If at the end of any calendar month, the total funds in the operating accounts shall exceed the amount required in order to maintain the working capital then on hand at the level of the Working Capital Standard provided in Section 7.1, then, contemporaneously with furnishing of the Financial Statement for such calendar month, pursuant to Section 7.4 hereof, Hyatt shall remit to Owner out of the operating accounts the amount of such excess (hereinafter

- 16 -

P30003141

Exhibit 1; Page 75

called the "Owner's Remittance Amount").  Each remittance shall be paid to Owner at Owner's address then in effect for receipt of notices hereunder by Owner, or at such other place as Owner may, from time to time, designate in a notice to Hyatt.

4.4        Supplemental Payment.

In addition to the Owner's Remittance Amount, to be paid by Hyatt under Section 4.3, Hyatt shall pay, in respect of each calendar month during the Term, as a supplemental payment to Owner, the amount deductible under Section 5.1 hereof in respect of such calendar month and payable under Section 5.1 into the Reserve Account referred to therein, such amount to be paid by Hyatt into such Reserve Account for the account of Owner.  This Section 4.4 shall become operative only if the Reserve Account established by Section 5.1 shall become funded as therein provided, and shall not be operative anytime the Reserve Account is not funded.

4.5        Performance Test.

The Owner's Objective for any year is the receipt of net Owner's Remittance Amounts (the total of Owner's Remittance Amounts less Hyatt's Annual Management Fee) equal to ten percent (10%) of the total amount of the Project Cost, as defined in Section 4.1(e)(2), plus the total amount of money that would be placed in the Reserve Account, as defined in Section 5.1, if the said account were to be funded.  If the Owner's Objective is not attained for any two consecutive fiscal years of operation, then Owner may terminate this Agreement upon written notice to Hyatt of such termination, within ninety (90) days after the delivery

- 17 -

P30003142

of the year end Financial Statements pursuant to Section
7.4(a), which notice shall specify a date of termination,
and Owner shall not be liable to Hyatt for any lost earnings
resulting from such termination.  In the event that Owner
does not elect to terminate this Agreement, then the Owner's
objective for the first year of such two year period shall
be deemed to have been met.

Section 5.            Replacement of Furnishings and Equipment.
    5.1               Furnishings and Equipment Reserve Account.
                (a)   A Furnishings and Equipment Reserve
Account (herein called "Reserve Account") shall be opened
for the purpose of setting aside a reserve for the purchase
of Furnishings and Equipment, and for expenditures for
Capital Improvements except for those paid by Owner under
Sections 5.1(b)(iii), 6.3, 6.4, 9.1 and 10.5 (and not for
those expenses which would be made under the repairs and
maintenance account of a hotel operation.)  For so long as
The Prudential Insurance Company of America ("Prudential")
is Owner of the Hotel, at Prudential's option, the Reserve
Account may be unfunded.  The provisions of Section 5.1(b)
hereof shall be applicable for the purposes of this Agreement,
whether or not the Reserve Account be funded, and if the
Reserve Account shall not be funded, the accounting transactions
required by Section 5.1(b) shall be made as book entries.

                (b)   Hyatt shall deduct from the operating
accounts for each calendar month included in such period the
"applicable amount," hereinafter defined, for such calendar
month and shall pay such amount deducted into the Reserve
Account.  The Reserve Account shall be maintained on deposit

- 18 -

P30003143

P30003144

by Hyatt in trust for Owner, in an interest bearing bank account. The moneys in the Reserve Account shall be the property of Owner. Interest earned during any period from the amounts in the Reserve Account shall be excluded in computing Gross Operating Profit for such period. To the extent that Hyatt shall be required to pay any income taxes on such interest as a fiduciary, the same shall be payable out of the Reserve Account.

(i) The "applicable amount" shall be two percent (2%) of Gross Revenue for each calendar month. For the purpose of determining the applicable amount, the term "Gross Revenue" shall mean Net Revenues of Total Operated Departments determined in accordance with the Current Uniform System on an accrual basis in accordance with generally accepted accounting principles consistently applied.

(ii) The management of the Hotel shall be entitled to withdraw from the Reserve Account in accordance with the Approved Budget any amounts approved by Owner to make all replacements of, and additions to, the Furnishings and Equipment and the Capital Improvements deemed to be necessary or desirable and approved by Owner, and the items of Furnishings and Equipment and Capital Improvements so replaced or added shall be and become, forthwith upon acquisition and installation, and without further act or action, the property of Owner and part of the Hotel. All such replacement or additional items may be purchased by Hyatt at competitive prices as approved by Owner. Owner reserves the right to require Hyatt to obtain competitive pricing information prior to purchasing any such replacement or additional items. Owner further reserves the right to review the competitive pricing information obtained by Hyatt and if the Owner can purchase the replacement or additional items at an equivalent or lower total cost, the Owner may purchase the items for Hyatt.

(iii) Hyatt shall not, without the approval of Owner, expend any moneys for replacements of, or additions to, the Furnishings and Equipment or for Capital Improvements in excess of the amount then existing in the Reserve Account, and, notwithstanding anything to the contrary contained in this Agreement, Hyatt's obligations with respect to additions to, or replacements of, Furnishings and Equipment and Capital Improvements shall be excused to the extent that the amount in such Fund is inadequate to meet such obligations. If Hyatt shall, with the approval of Owner, expend such

- 19 -

P30003145

money in excess of the amount then existing in the Reserve Account, as if the Reserve Account were funded, the amount so expended shall be deemed to be an addition to Project Cost of the Hotel for the fiscal year in which the excess amounts are expended for the purpose of determining Adjusted Profit. Owner shall be obligated to make sufficient funds available to Hyatt so that the Hotel can be maintained at all times during the term in accordance with the standard of a first class hotel.

(iv)  Any funds received from the proceeds of the sale of any Furnishings and Equipment from the Hotel shall be paid into the Reserve Account or directly to the Owner at Owner's sole discretion.

(v)  Any amounts remaining in the Reserve Account at the termination or expiration of the Term or at the time Prudential elects that the Reserve Account be unfunded shall be returned by Hyatt to Owner.

5.2       Labeling of Items Purchased.

As the replacement or additional items are purchased and installed, Hyatt shall label each item with the year of acquisition in conformity with Internal Revenue Service requirements for use of the Asset Depreciation Range method of depreciation by Owner.

5.3       Liens.

Should Hyatt receive notice of any lien, encumbrance or charge upon the Real Property arising out of any action taken by Hyatt pursuant to this Section 5, Hyatt shall immediately give Owner notice of the same with a photocopy of the notice and all supporting documents received by Hyatt.

Section 6.       Repairs and Changes; Legal Requirements.

6.1       Repairs and Maintenance.

Hyatt shall, throughout the Term, take good care of the Hotel and maintain the same in good order and condition and make all reasonably necessary repairs

- 20 -

P30003146

thereto; provided, however, that Hyatt shall be relieved of such obligation to the extent that there is unavailable to it either from the operating accounts or from Owner, sufficient funds to fulfill such obligation.

    6.2                <u>Alterations and Additions.</u>

            Except as hereinafter provided, Hyatt shall make no alterations, additions or improvements in or to the Improvements without the approval of Owner. Notwithstanding the preceding sentence, Hyatt shall have the right without Owner's approval, from time to time during the Term, to make alterations, additions or improvements in or to the Improvements, which shall become part thereof, for the purpose of improving the operation of the Hotel, provided that the aggregate amount which may be incurred in respect thereof during any fiscal year shall not exceed ten percent (10%) of the aggregate amount deductible under Section 5.1 for each of the calendar months included in such fiscal year. Should Hyatt receive notice of any lien, encumbrance or charge upon the Real Property arising out of any action taken by Hyatt pursuant to this Section 6.2, Hyatt shall immediately give Owner notice of the same with a photocopy of the notice and all supporting documents received by Hyatt. Hyatt shall take whatever action with Owner's approval is necessary to remove the lien, encumbrance, or charge, provided, however, that this obligation on Hyatt shall not be deemed to require Hyatt to expend funds except on behalf of Owner.

    6.3                <u>Owner's Additions.</u>

            Owner shall have the right, subject to as little interference with the operation of the Hotel as possible, from time to time during the Term to make major

- 21 -

P30003147

changes to the structure of a capital nature and to make
alterations, additions or improvements in or to the Hotel.
The plans and specifications for any such alterations,
additions or improvements shall be submitted to Hyatt for
its prior approval, which approval will not be unreasonably
withheld.  The funds for any such major repairs to the
structure, alterations, additions or improvements shall be
supplied by Owner and the amount thereof shall constitute
the basis for an addition to the Project Cost as and when
expended, unless Hyatt and Owner shall otherwise agree.

    6.4         <u>Required Changes</u>.

           In the event that at any time during the
Term structural repairs to or changes in the Building shall
be required by reason of any laws, statutes, ordinances,
governmental rules now or hereafter in force, or by order of
any governmental or municipal power, department, agency,
authority or officer, Owner may, but shall not be obligated
to, make and pay for such repairs or changes and the amount
of the cost thereof shall constitute the basis for an
addition to the Project Cost.  Structural repairs or changes
shall be made with as little hinderance to the operation of
the Hotel as possible.  In the event that Owner should elect
not to make the structural repair or change required under
this Section 6.4, Owner shall have the right to terminate
the operation of the Hotel, and this Agreement shall terminate,
and Prudential shall have no liability to Hyatt due to its
decision to terminate operation of the Hotel and this Agreement
pursuant to this Section 6.4.  If Owner shall elect to
reopen the Hotel within two (2) years of the date of the
aforesaid termination of this Agreement, Owner shall then

- 22 -

P30003148

Exhibit 1; Page 82

notify Hyatt of its intent to reopen the Hotel and Hyatt then shall have the first right to manage the Hotel, provided that such management shall be under the same terms and conditions as contained in this Agreement.  Hyatt shall notify Owner within thirty (30) days of receipt of the aforesaid notice from Owner, whether or not Hyatt will manage the Hotel pursuant to the terms and conditions of this Agreement.

Section 7.       <u>General Covenants of Hyatt and Owner</u>.

    7.1              <u>Working Capital</u>.

Except as otherwise in this Agreement specifically provided, Owner shall, on the Opening Date and at all times during the Term, cause sufficient working capital funds to be on hand in the operating accounts to assure the timely payment of all current liabilities of the Hotel and all other items entering into the calculation of Gross Operating Profit, the uninterrupted and efficient operation of the Hotel at all times during the Term and the performance by Hyatt of its other obligations hereunder.

As of any date Owner shall be deemed to have met its obligation under the foregoing provisions of this Section 7.1 if the working capital then on hand in the operating accounts, as determined in accordance with generally accepted principles of accounting, shall equal or exceed the sum of $100,000.00, or such other amount as shall be agreed upon in writing between the parties hereto (such sum of $100,000.00 or other amount so agreed upon being herein called the "Working Capital Standard").  The amount of working capital may be increased to meet seasonal bills upon

- 23 -

P30003149

the written approval of Owner.  The parties agree from time to time to review and, if necessary, adjust the Working Capital Standard in accordance with then existing or anticipated conditions affecting the business of the Hotel.

     7.2          <u>Chain Services</u>.

          Hyatt shall provide, or shall cause its affiliates to provide, in connection with the operation and for the benefit of the Hotel, those group benefits, services and facilities (hereinafter called the "Chain Services") generally made available by Hyatt from time to time during the Term to hotels (which term, as used herein, does not include Hyatt Lodges or any hotel not operated under a name which includes the word "Hyatt") operated by Hyatt or its affiliates.  Chain Services presently consist of (i) convention, business and sales promotion services (including the maintenance and staffing of Hyatt's home office sales force and of regional sales offices in various parts of the United States and the world), (ii) advertising, publicity and public relations services, (iii) food and beverage, personnel and other operational departmental supervision and control services, (iv) centralized reservations services in Omaha, Nebraska, and (v) the making available of qualified personnel through the Hyatt employee training program.  Neither Hyatt nor any of its affiliates shall charge or receive any profit in respect of any such Chain Services.  Hyatt shall, however, be entitled to charge the operation of the Hotel and to be reimbursed for the Hotel's prorata share of "Allocable Chain Expense."  "Chain Expense" for any period shall include all costs incurred during such period by Hyatt or by any of its affiliates in respect of Chain Services, other than the

- 24 -

P30003150

costs of food and beverage, personnel and other operational departmental supervision and control services. "Allocable Chain Expense" for any period shall mean all Chain Expense incurred during such period, reduced by any amounts which Hyatt or any of its affiliates shall be entitled to be paid in respect of Chain Services furnished during such period to hotels which are situated outside of the United States (whether or not opened to the public) or which are situated in the United States but are not opened to the public (for the reason that they are under construction or are otherwise being prepared for opening). The Hotel's prorata share of Allocable Chain Expense for any period shall bear the same ratio to the Allocable Chain Expense for such period as the number of guest rooms in the Building bears to the average number of guests rooms in all hotels in the United States opened to the public and operated during such period by Hyatt or its affiliates. Each time that Hyatt shall charge the operation of the Hotel for its prorata share of Allocable Chain Expense for any period, it shall furnish to Owner a statement in reasonably sufficient detail to provide Owner with data supporting such charge. Owner may, in connection with any such statement for any period, cause an audit to be made of the books and records of Hyatt and its affiliates relating to the data furnished in such statement, including, without limitation, the Chain Expense and Allocable Chain Expense incurred during such period and the average number of key guest rooms during such period in hotels opened to the public and situated in the United States and operated by Hyatt or its affiliates. Such audit shall be made by Owner's auditors and a copy of such audit shall be furnished to

- 25 -

P30003151

Hyatt.  If the audit of any such statement shall disclose
that such statement is inaccurate, appropriate adjustment
shall be made as between Owner and Hyatt to correct such
inaccurancy, and, if such audit shall disclose that the
charge made to the Hotel for the period covered by such
statement exceeds, by five percent (5%) or more, the amount
of the charge which should have been made, then Hyatt shall
pay for the reasonable cost of such audit; otherwise, Owner
shall pay for the cost of such audit.

      7.3              **Right of Inspection and Review.**

              Hyatt shall accord to Owner or the
Ground Lease Landlord and their duly authorized agents the
right to enter upon any part of the Hotel at all reasonable
times during the Term for the purpose of examining or inspecting
the Hotel or examining or making extracts from the books and
records of the Hotel operation, or for any other purpose
which Owner or the Ground Lease Landlord, in their discretion,
shall deem necessary or advisable, but the same shall be
done with as little disturbance to the operation of the
Hotel as possible.

      7.4              **Financial Reports and Audit.**

              Hyatt shall keep at the Hotel complete,
accurate and separate books of account and other records
reflecting the results of the operation of the Hotel.  Such
books and records (excluding work papers and other back-up
after two years unless Owner shall have required their
retention after two years) shall be retained permanently at
the Hotel and shall not be discarded without the approval by
Owner.  Such books and records shall, except as otherwise
specified in this Agreement, be kept in all material respects

<center>- 26 -</center>

in accordance with generally accepted accounting principles consistently applied.

(a)  Hyatt shall deliver to Owner, within twenty (20) days after the end of each calendar month, an unaudited financial statement prepared from the books of account maintained by Hyatt and containing (i) a statement of the current assets and current liabilities of the Hotel as of the end of such calendar month, (ii) a profit and loss statement showing the results of operation of the Hotel including store rentals for such calendar month and for the Cumulative Period in respect of such calendar month, as well as for the corresponding periods in the immediately preceding year of operation, (iii) a statement of the Gross Receipts for such calendar month and such Cumulative Period, showing the gross income from the rental of rooms, as well as for the corresponding periods in the immediately preceding year of operation, and (iv) a report comparing actual income and expenses to forecast income and expenses.  The statements provided shall contain sufficient detail as specified by the Owner to show a computation of revenue; Gross Operating Profit; and the tentative monthly installment of Hyatt's Basic Fee; as well as a statement of the amount of Working Capital as of the end of such month; a statement of the disbursements and balances in the Reserve Account, or if the Reserve Account is not funded, an itemized statement of additions to Furnishings and Equipment and to Capital Improvements made during the calendar month; and a report of Accounts Receivable (Aging).  Additionally, Hyatt shall provide Owner with copies of all utility bills; all repair and maintenance bills, including, but not limited to

- 27 -

those for HVAC, plumbing, and electrical maintenance and repair; and such invoices as Owner may from time to time request, for the calendar month.

       (b) Owner shall have the right to audit the books of Hyatt's operation of the Hotel at any time, with its internal auditors, and/or independent auditors, at Owner's sole discretion. If Owner is required under the Ground Lease to provide certified financial statements to the Ground Lease Landlord, then Owner shall have the right to have accountants of its choice audit the books of operation of the Hotel at any time. The cost of any audit hereunder shall be charged against the Hotel's operating expenses.

       (c) Hyatt shall in good faith prepare and submit to Owner on or before November 1st of each year the following: (1) an annual budget to forecast in detail its proposed operation for the forthcoming fiscal year together with an itemization of its projected revenues, and all expenses of operation of every nature and kind anticipated to be charged to the operation, and in particular those types of expenses referred to in this Agreement for such fiscal year, (2) an annual detailed capital budget for expenditures from the Reserve Account, whether the same be funded or not, in format acceptable to Owner, and (3) an annual marketing plan. The budgets and marketing plan will be subject to the approval of the Owner, and Owner hereby agrees to examine each budget submitted to it by Hyatt in accordance with the foregoing, and if found reasonable and proper, Owner will then approve such budget, it being contemplated that the budgets will be agreed upon by the parties hereto within 30 days after submission of the same by Hyatt to

- 28 -

Owner.  In case of a dispute with regard to a budget, then, pending the settlement thereof, Hyatt will be entitled to continue to operate the Hotel in accordance with the standards herein set forth at levels of expenditure comparable to those of the preceding year, and in connection therewith to make such expenditures from Owner's funds as it reasonably deems necessary for such continued operations, it being understood, however, that in such cases Hyatt shall be entitled to make expenditures for repairs and maintenance, and for replacement of Furnishings and Equipment, for the current fiscal year on the basis of annual expenditures in an amount not exceeding five percent (5%) of the estimated Gross Revenue of the Hotel for the then current fiscal year (determined in accordance with the Current Uniform System).

(d)  Hyatt shall provide Owner with copies of its policies regarding Hyatt operational standards solely for informational purposes and not for approval by Owner, so that Owner may evaluate the reports and budgets required by the foregoing subparagraphs.  As these policies are revised, Hyatt shall provide Owner with copies of the revisions.

7.5      Payment of Taxes.

Owner shall remit, prior to delinquency, all ad valorem taxes and assessments (levied on both real and personal property) which may become a lien upon all or any part of the Hotel and which may become due and payable during the Term, unless payment thereof is in good faith being contested by Owner. The reasonable expenses of any such contest shall be deductible in computing Adjusted Profit for the period in which incurred.  Any such taxes or assessments which relate to a

- 29 -

P30003155

period which includes the dates on which the Term commences or expires or otherwise terminates shall be equitably prorated as of such dates.  If Hyatt should receive notice of any taxes due, it shall immediately forward said notice to Owner.  Any penalties, interest, and any other damage resulting from failure by Hyatt to forward such notices shall be paid by Hyatt.

7.6     Indemnification by Hyatt.

To the extent that Owner shall not be fully covered by insurance, Hyatt shall indemnify Owner and hold it harmless from any damages, liability, cost, claim or expense, including attorneys' fees, arising out of or in connection with the operation of the Hotel or Hyatt's operations other than at the Hotel.  The costs of such indemnity shall be borne as follows:

(a)  if the damage, liability, cost, claim or expense is attributable to Hyatt's gross negligence, willful misconduct, willful violation of any Legal Requirements or breach of this Agreement (other than Hyatt's covenant to comply with the Legal Requirements), the cost of such indemnification shall be borne solely by Hyatt and shall not be charged against Gross Operating Profit;

(b)  if the damage, liability, cost, claim or expense is attributable to any other reason or cause, the cost of such indemnification shall be paid by Hyatt out of the operating accounts and may be charged against the Gross Operating Profit;

7.7     Indemnification of Hyatt.

Upon termination of this Agreement, whether by lapse of time or otherwise, Owner shall indemnify and hold harmless Hyatt and its directors, officers, employees and

- 30 -

agents from and against any and all liability, loss, damages, costs and expenses arising out of, or incurred in connection with, the management and operation of the Hotel except to the extent that the same were caused by the gross negligence, willfull misconduct, willful violation of Legal Requirements or willful breach of this Agreement by Hyatt (other than compliance with Legal Requirements).  The amount of any such indemnity shall be adjusted to reflect the impact, if any, on Hyatt's Annual Management Fee.

SECTION 8.              INSURANCE.

  8.1              Owner's Coverage.  Owner agrees to procure and maintain at all times during the term of this Agreement the following insurance:

              (a)  All risks, including earthquake and flood, property insurance in an amount equal to full replacement value on the Hotel and FF&E. Business Interruption and Extra Expense, as well as Rental Value coverage shall be included.

              (b)  Comprehensive boiler and machinery coverage including direct damage, Business Interruption and Extra Expense in an amount not less than $25,000,000.00.  With respect to the coverages specified in subparagraphs (a) and (b) of this Section 8.1, property losses up to $10,000 per occurance will be paid out of the Operating Accounts.

              (c)  Comprehensive General Liability insuranc including bodily injury, personal injury, property damage, produc liability, innkeeper's liability (including theft), contractual liability, and liquor liability in an amount not less than $1,000,000.00 combined single limit with a $25,000,000.00 umbrel Hyatt Corporation shall be named as an additional insured under this coverage.

-31-

8.2          Hyatt Coverage.

Hyatt agrees to procure and maintain at all times during the term of this Agreement, a minimum of the following insurance:

(a)  Worker's compensation and Employer's Liability coverage in compliance with the statutes of the state of Virginia.  The cost of this insurance shall be reimbursed to Hyatt from the Operating Account as set forth in Section 3.4. It is understood that Hyatt, the law permitting, intends to self-insure for worker's compensation insurance and such self-insurance shall comply with Section 8.8.

(b)  Comprehensive crime insurance covering all of Hyatt's employees in an amount not less than $500,000.00. It shall include a $500,000.00 employee fidelity limit of liability, $500,000.00 broad form money and securities and $500,000.00 depositor's forgery.  Each loss shall be subject to a $5,000.00 deductible.  The cost of this insurance shall be reimbursed to Hyatt from the Operating Account as provided in Section 3.4 hereof, but only to the extent that such insurance is applicable to employees of Hyatt actually employed at the Hotel.

8.3          Subcontractor's Insurance.

Hyatt shall require that all subcontractors brought onto the Property have insurance coverage at the subcontractor's expense, in the following minimum amounts:

(a)  Worker's Compensation - Statutory Amount.
Employer's Liability - not less than $250,000.

(b)  Comprehensive General Liability including Bodily Injury, Personal Injury, Property Damage, Products Liability and Contractual Liability; not less than $1,000,000.00 combined single limit.

-32-

P30003158

Hyatt must obtain the Owner's permission to waive any of the above requirements. The Manager shall obtain and keep on file a Certificate of Insurance which shows that the subcontractor is so insured.

8.4     Blanket Insurance.

Any insurance provided by Owner or Hyatt under this Article 8 may be affected under policies of blanket insurance which may cover other properties of Owner and The Prudential Insurance Company of America and its affiliates, and Hyatt Corporation and its affiliates, and an allocable portion of such premiums will be charged to the Hotel.

8.5     Waiver of Subrogation.

Landlord's policies with respect to the coverage provided in Section 8.1 (a) and (b) hereof shall contain a waiver of subrogation with respect to Hyatt and any property or business interruption insurance obtained by Hyatt shall contain a waiver of subrogation with respect to Owner and the Ground Lease Landlord.

8.6     Compliance.

Hyatt agrees to comply with, fulfill and perform all rules, orders, ordinances, regulations and requirements, imposed by, or in connection with, or affecting the premiums for, policies of insurance upon the Hotel, and relating to the use of the Hotel by Hyatt, tenants or any other person. If Hyatt shall fail to comply with, fulfill and perform any such rules, orders, ordinances, regulations or requirements, Owner may, but shall be under no obligation to, comply with, fulfill and perform the same and Hyatt shall reimburse Owner for any and all sums expended by it therefor.

-33-

P30003159

Exhibit 1; Page 93

8.7             Insurance Requirements.

All insurance policies contemplated by this Section 8 shall conform to the following requirements:

(a) Hyatt shall not, on Hyatt's own initiative or pursuant to the request or requirement of any third party, including any lease-hold mortgagee or any sublessee, take out separate insurance concurrent in form or contributing in the event of loss with that required in this Section 8, to be furnished by, or which may reasonably be required to be furnished by Owner, or increase the amounts of any then existing insurance required to be secured by Hyatt pursuant to Section 8.2 hereof by securing an additional policy or additional policies, without the prior written Consent of Owner. All policies obtained by Hyatt pursuant to this Agreement shall comply with the requirements set forth in this Section 8.7.

(b) Provisions as to acceptable insurance companies and evidence of the policies being in force, as follows:

(1) All insurance provided for in this Section 8 shall be effected under valid and enforceable policies issued by insurers of recognized responsibility which are licensed to do business in the state wherein the Real Property is located and which have been approved in writing by the Ground Lease Landlord as to the qualification of insurers and the amounts of insurance to be written by each.

(2) Upon execution of this Agreement and not less than (30) days prior to the expiration dates of the expiring policies theretofore furnished by Hyatt pursuant to this Section 8, originals of the policies, or certificates thereof, shall be delivered by Hyatt to Owner. Owner will furnish to Hyatt certificate of Comprehensive General Liability insurance described in Section 8.1 (c).

-34-

P30003160

(c)  Named insured and loss payable provisions, in the crime and fidelity insurance shall, to the extent possible, name Hyatt, Owner, and Ground Lease Landlord as the insureds as their respective interest may appear.

(d)  Each policy or certificate of insurance in this Article 8 mentioned and required, shall have attached thereto (a) an endorsement that such policy shall not be cancelled nor materially changed without at least thirty (30) days' prior written notice to Owner, Ground Lease Landlord, and leasehold mortgagee, any fee mortgagee and to any sublessee who shall have previously requested such notice, or to any other additional insured, (b) an endorsement to the effect, that the insurance as to any one insured shall not be invalidated by any act or neglect to any other isured, and, if possible (c) an endorsement pursuant to which the insurance carrier waives all rights of subrogation to the interest of any leashold mortgagee or fee mortgagee.

(e)  Hyatt shall, upon request, furnish to Owner insurance appraisals of the full insurable value of the Improvements and FFE.  The expense of such appraisal, if any, shall be allocated in the same manner as the expense for the property insurance premiums.

8.8        Hyatt Self-Insurance.

Owner understands that Hyatt customarily and in the course of managing the hotels in its chain, self-insures and assumes the risk of certain losses and liabilities and places certain coverage with an affiliated insurance carrier.  Subject to the next succeeding paragraph, and provided Hyatt has not assigned this Agreement to any other entity, Owner agrees that Hyatt may, in submitting the Hyatt bid, be a self-insurer of all or any of the risks described in this Section 8, or may place coverage with such affiliated carrier, so long as such self-

-35-

P30003161

Exhibit 1; Page 95

insurance or coverage is consistent in type and amount with Hyatt's self-insurance or coverage practices at other hotels, and further provided that such self-insurance or coverage with such affiliated carrier is in compliance with all applicable statutes, regulations and laws of the Commonwealth of Virginia or any other governmental entity having jurisdiction over the Hotel.

In the event that Hyatt self-insures, it will carry insurance, in customary amounts, above the self-insured deductibles protecting Owner, the Ground Lease Landlord and Hyatt.  Owner and the Ground Lease Landlord shall be named as additional insureds as their interest may appear in said policies. Owner shall have the right on an annual basis to review the loss experience of this hotel against the self-insured deductibles, and if the premiums for first dollar coverage for the self-insured deductibles under either of the coverages required by this Section 8 shall be less than the loss experience charged against the hotel by virtue of the herein permitted self-insurance, then Owner may require Hyatt to obtain full insurance coverage for crime and employee theft or for workmen's compensation in accordance with the other provisions of this Section 8.

Section 9.          Damage to and Destruction of Hotel.
    9.1           Owner's Duty of Restoration.

If the Hotel, or any portion thereof, shall be be damaged or destroyed at any time or times during the Term by fire or any other casualty, Owner, at no expense or risk to Hyatt, shall, subject to Owner's right to demolish and rebuild the building under Section 11.02(a) of the Ground Lease, repair, rebuild or replace the same (such repairing, rebuilding or replacing being hereinafter called "restoration") so that after such restoration the Hotel shall be substantially the same as prior to such damage or destruction, and all proceeds of insurance shall be made available to Owner for this purpose in accordance with Ground Lease Article 16 to ensure that such proceeds of insurance shall be applied to such restoration.  If the cost of such restoration exceeds available proceeds of insurance,

-35a-

such excess, when paid, shall constitute an addition to Project Cost as provided in Section 4.1(e)(2).

9.2        Owner's Election Not to Restore.

Anything in Section 9.1 to the contrary contained notwithstanding, in connection with any casualty, if the cost of restoring the Hotel shall equal or exceed (i) twenty-five percent (25%) of the initial investment thereof immediately prior to such casualty should such casualty be covered by insurance, or (ii) ten percent (10%) of such replacement cost should such casualty not be covered by insurance, or if Owner has exercised its right in Section 11.02(a) of the Ground Lease to demolish and rebuild the building, then, and in either event, Owner may terminate this Agreement by giving notice to Hyatt within forty-five (45) days from the occurrence of such casualty; without paying additional fees or penalties to Hyatt.

Section 10.        Condemnation.

10.1        This Agreement shall terminate as of the effective date of the occurrence of any of the following events:

(a)  The whole of the Improvements and the Land be taken or condemned by reason of any eminent domain, condemnation, compulsory acquisition or like proceeding by any competent authority for any public or quasi-public use or purpose, no matter how temporary the period of the use (all of the foregoing actions hereinafter called a "Taking"); or

(b)  Such a portion of the Improvements and the Land be taken or condemned as to make it imprudent

- 36 -

P30003163

Exhibit 1; Page 97

or unreasonable, in the sole discretion of Owner, to use the remaining portion as a hotel of the type and class as existed immediate preceding such Taking; or

(c)  Owner exercises its option under Section 17.02(b) of the Ground Lease to terminate the Ground Lease if such a portion of the Improvements and the Land be taken as the remaining portion cannot be so repaired or reconstructed as to constitute a complete rentable structure capable of producing net annual income after deducting Operating Expenses bearing approximately the same ratio to estimated value of the remaining portion after restoration, repair or construction as the net annual income after deducting Operating Expenses produced by the Improvements and Land immediately prior to the Taking bore to the value of the Improvements and Land immediately before the Taking, and Owner shall then have no liability to compensate Hyatt for any loss of earnings as a result of such termination.

10.2      The average net annual income produced by the Improvements and Land during the five year period immediately preceding such Taking, shall be deemed to constitute the actual net annual income immediately prior to the Taking for the purposes of Section 10.1.  As used in this Section, the term "Operating Expenses" shall be deemed to exclude depreciation, income taxes, franchise taxes, and interest and amortization of any leasehold mortgage shall be deemed to include, but without limitation, all Ground Rent.

10.3      Hyatt shall have no interest whatsoever in any award for such Taking, whether such award be as compensation or diminution in value of the Improvements and Land.  Further, Hyatt shall have no right to defend against

- 37 -

P30003164

Exhibit 1; Page 98

any such Taking or sue for or appeal from any such award, and, in the exercise of such right, to compromise and settle any such action or award.

10.4    Hyatt shall continue to operate the Hotel under this Agreement and to perform all of its obligations under this Agreement until such time as Hyatt shall be required to surrender possession of the Improvements and Land as a consequence of such Taking, but not thereafter, although any liability of Hyatt or Owner under this Agreement shall survive such surrender.

10.5    If only a part of the Improvements and Land shall be taken or condemned and the Taking or condemnation of such part does not make it unreasonable or imprudent in the sole discretion of Owner, to operate the remainder as a hotel of the type and class immediately preceding such Taking or condemnation, this Agreement shall not terminate, but Owner shall repair any damage to the Improvements, or any part thereof, or shall alter or modify the Improvements, or any part thereof, so as to render the Improvements a complete and satisfactory architectural unit as a hotel of the same type and class immediately preceding the Taking or condemnation.

Section 11.    Events of Default; Termination Rights.

11.1 .    Events of Default.

If at any time, or from time to time, during the Term any of the following events of default (each being hereinafter called an "Event of Default") shall occur and not be remedied within the periods of time hereinafter specified, namely:

- 38 -

P30003165

(a)  The failure of Hyatt or Owner to pay any sum which may become due hereunder within fifteen (15) days after of a notice specifying such failure; or

(b)  If Hyatt shall apply for or consent to the appointment of a receiver, trustee or liquidator of Hyatt or of all or a substantial part of its assets, file a voluntary petition in bankruptcy, or admit in writing its inability to pay its debts as they become due, make a general assignment for the benefit of creditors, file a petition or an answer seeking reorganization or arrangement with creditors or to take advantage of any insolvency law, or file an answer admitting the material allegations of a petition filed against Hyatt in any bankruptcy, reorganization or insolvency proceeding, or if an order, judgment or decree shall be entered by any court of competent jurisdiction, on the application of a creditor, adjudicating Hyatt a bankrupt or insolvent or approving a petition seeking reorganization of Hyatt or appointing a receiver, trustee or liquidator of Hyatt or of all or a substantial part of its assets; or

(c)  If Hyatt or Owner shall fail to perform, keep or fullfill any of the other covenants, undertaking, obligations or conditions of this Agreement, and any such default shall continue for a period of (1) five (5) days in case of abandonment or vacation by Hyatt and thirty (30) days in case of some other default or (2) such additional time as may be reasonably required to cure such default, other than abandonment or vacation, provided Hyatt or Owner commences action to cure such default within thirty (30) days and thereafter continues diligently to cure such default; then in the case of any such Event of Default, Owner or

- 39 -

P30003166

Hyatt, as the case may be, may, in addition to any other
rights or remedies which it may have at law or in equity,
immediately or at any time thereafter, unless and until such
default and all intervening defaults shall be remedied, by
notice to the other party declare this Agreement to be
terminated, in which event the Term and all right, title and
interest of Hyatt hereunder shall expire on the date such
notice is received by Hyatt as fully and completely as if
that day were the date herein specifically fixed for the
expiration of the Term, and Hyatt will thereupon cease to
manage and operate the Hotel.

Section 12.          Trade Name.

          During the Term the Hotel shall at all
time be known and designated as "Hyatt Arlington" except as
may otherwise be mutually agreed upon by Owner and Hyatt.
Hyatt represents and warrants to Owner that Hyatt has the
legal right to use the name "Hyatt" (hereinafter called the
"protected name"), either alone or in conjunction with
another word or words, which legal right includes the right
to call the Hotel "Hyatt Arlington". Owner acknowledges that
the protected name, when used either alone or in conjunction
with any other word or words, is the exclusive property of
Hyatt. Accordingly, Owner agrees that no right or remedy of
Owner for any default of Hyatt hereunder, nor the delivery
of possession of the Hotel to Owner upon the expiration or
sooner termination of the Term, nor any provision of this
Agreement, shall confer upon Owner, or any transferee,
assignee or successor of Owner, or any person, firm or
corporation claiming by or through Owner, the right to use

- 40 -

P30003167

either of the protected names, either alone or in conjunction with any other word or words, in connection with the use or operation of the Hotel or otherwise.  In the event of any breach of this covenant by Owner, Hyatt shall be entitled to relief by injunction, and in the case of deliberate breach to damages and to all other available legal rights or remedies, and this provision shall be deemed to survive the expiration or sooner termination of the Term.  Nothing herein is to be construed as inferring that Owner guarantees against the action of its transferees or assigns.

Section 13.            Successors and Assigns.

13.1            Assignment by Hyatt.

Hyatt shall have the right to assign its rights and obligations under this Agreement, without the consent of Owner (a) to any affiliate of Hyatt which does not operate gaming tables or any other form of gambling or (b) to any assignee which does not operate gaming tables or any other form of gambling who also acquires all, or substantially all, of the assets of Hyatt and assumes its obligations, including those hereunder, such assignee under these clauses (a) and (b) shall after such assignment operate, directly or through affiliates, hotels under a name which includes the word "Hyatt" containing an aggregate of at least 10,000 key guest rooms, and shall immediately prior to such acquisition have a net worth at least equal to that of Hyatt at such time (both of the foregoing assignments being hereinafter referred to as "permitted assignment").  In the event of a permitted assignment to a person other than an affiliate, Hyatt's liability except for any claims by Owner arising

- 41 -

prior to the effective date of such assignment hereunder shall terminate upon such assignment, but in the event of such an assignment to an affiliate Hyatt shall continue to be liable under this Agreement to the same extent as though such assignment had not been made.  Except as hereinabove provided, Hyatt shall not assign its rights and obligations under this Agreement without the approval of Owner.  In the event that Hyatt shall assign its rights and obligations under this Agreement to any affiliate (the "assignee affiliate"), as hereinbefore provided, then the sale by Hyatt or by an affiliate of a controlling interest in such assignee affiliate shall constitute an assignment of Hyatt's interest requiring Owner's approval, as provided in the immediately preceding sentence, except for a sale which is part of a sale of all, or substantially all, of the assets of Hyatt to an assignee who assumes its obligations, including those hereunder and which, if a direct assignment of this Agreement were involved, would qualify as a permitted assignment under clause (b) above (in which case, any contingent liability of Hyatt hereunder shall terminate upon such sale).  A "controlling interest" in an affiliate refers to shares of capital stock representing more than fifty percent (50%) of the voting power of such affiliate.

It is understood and agreed that any approval given by Owner to any assignment shall not be deemed a waiver of the covenant herein contained against assignment in any subsequent case.  Any assignee who succeeds to the interest of Hyatt hereunder (or to the interest of an assignee of Hyatt hereunder) shall be deemed to be Hyatt hereunder for all purposes. The term "affiliate", as used

- 42 -

herein, shall mean a corporation included in an "affiliated group", as that term is defined in Section 1504(a) of the Internal Revenue Code as presently in effect, and of which Hyatt is the common parent corporation. The term "assignment" as used herein shall include a merger, consolidation or similar transaction.

13.2        Assignment by Owner.

Owner shall have the right to sell, lease, mortgage, hypothecate or convey the Hotel subject to this Agreement or to assign this Agreement, or both, without the approval of Hyatt, and Hyatt agrees to cooperate with Owner in connection with any such transaction and Hyatt shall attorn to such buyer, lessee, mortgagee or assignee, provided, however, that any buyer, lessee, mortgagee, or assignee shall expressly assume in writing the obligations of Owner hereunder. Owner shall have no liability under this Agreement after the date of any sale, lease, assignment, or conveyance of the Hotel, except for Owner's obligations hereunder arising prior to the date of assignment. With respect to any mortgagee, Owner shall furnish Hyatt with an address where notice may be served upon such mortgagee. Hyatt agrees that simultaneously with the giving to Owner of any notice of default or termination hereunder it will concurrently send a copy of such notice to any such mortgagee, and no notice to Owner of any default or termination hereunder shall be effective unless a copy of such notice has been sent to any such mortgagee as herein provided. Hyatt further agrees that it shall not exercise any right of termination in connection with such default, if, within the grace period provided, mortgagee shall give Hyatt notice of its intention

- 43 -

to cure such default and shall proceed diligently to do so.

13.3          Effect of Assignment.

The terms, provisions, covenants, under-takings, agreements, obligations and conditions of this Agreement shall be binding upon and shall inure to the benefit of the successors in interest and the assigns of the parties hereto with the same effect as if mentioned in each instance where the party hereto is named or referred to, except that no assignment, transfer, pledge, mortgage or sublease by or through Hyatt or any sublessee or by or through Owner, as the case may be, in violation of the provisions of this Agreement, shall vest any rights in the assignee, transferee, mortgagee, pledgee, sublessee or occupant.

Section 14.          Notices.

All notices to be given hereunder shall be given in writing and shall be deemed given when delivered by messenger or by the U.S. mails, with postage prepaid, registered or certified, and, delivered or addressed as follows:

OWNER:                    The Prudential Insurance Company of
                          America
                          Capital Real Estate Investment Office
                          Suite 400
                          1150 - 17th Street, N.W.
                          Washington, D.C.  20036
                          Attention:  Regional Vice President,
                                      Real Estate Operations

With a copy of said notice sent to each of the following:

                          The Prudential Insurance Company of
                          America
                          Prudential Plaza
                          Newark, New Jersey  07101
                          Attention:  Mr. Allen Ostroff
                                      Vice President

- 44 -

P30003171

Exhibit 1; Page 104

The Prudential Insurance Company of
America
Capital Real Estate Investment Office
Suite 400
1150 - 17th Street, N.W.
Washington, D.C.  20036
Attention:  Regional Counsel,
Real Estate Operations

HYATT:                      Hyatt Corporation
~~9701 West Higgins Road~~ 9700 W Bryn Mawr
Rosemont, Illinois  60018
Attention:  Harold S. Handelsman, Esq.

Either party hereto may change the address for notices hereunder
by such party giving notice of such change to the other party
hereto in the manner hereinabove provided.  If Hyatt is given
the name and address of any mortgagees, it will give copies of
all notices given to Owner to such mortgagees, in the manner set
forth in this Section 14.

Section 15.          Applicable Law.

This Agreement shall be governed in all
respects by the laws of the State of Virginia.

IN WITNESS WHEREOF, Owner and Hyatt have
executed this Agreement as of the day and year first above set
forth.

ATTEST:                      THE PRUDENTIAL INSURANCE COMPANY
                             OF AMERICA, a New Jersey corporation

_____      By: _____
Assistant Secretary                   Vice President

ATTEST:                      HYATT CORPORATION, a Delaware
                             corporation

_____      By: _____
..Secretary                           S.v. President

- 45 -

P30003172

Exhibit 1; Page 105

# EXHIBIT A

BEGINNING at the intersection of the westerly line of N. Ft. Myer Drive with the northerly right-of-way line of Wilson Boulevard; thence running with the northerly right-of-way line of Wilson Boulevard S. 82 degrees 49' W. - 275.68 feet to its intersection with the easterly right-of-way line of N. Nash Street; thence running with said easterly right-of-way line of N. Nash Street along the following courses and distances:  N. 1 degree 16' 00" W. - 58.71 feet and N. 14 degrees 02' 00" E. - 94.34 feet to a point, said point being a corner common to Lot 9 and Lot 10 of the Subdivision of Arlington Plains; thence departing from said street line and running with the side line common to Lot 9 and Lot 10 of the Subdivision of Arlington Plains, N. 89 degrees 25' 00" E.  250.75 feet to a point, said point lying in the aforementioned westerly right-of-way line of N. Ft. Myer Drive; thence running with said westerly right-of-way line of N. Ft. Myer Drive, S. 0 degrees 35' 00" E. - 118.32 feet to the point of beginning containing 35,739 square feet of land.

SUBJECT, however, to easements, rights-of-way and restrictions of record.

P30003173

Exhibit 1; Page 106



RESOLVED, that the Hotel Association of
New York City adopts and recommends to
the hotel fraternity the Uniform System
of Accounts for Hotels as submitted by the
Accountants' Committee; and it is further

RESOLVED, that such Uniform System of
Accounts for Hotels be copyrighted in the
name of this Association.

*March, 1926*



RESOLVED, that the American Hotel Asso-
ciation of the United States and Canada
adopts the Uniform System of Accounts for
Hotels as recommended by the Hotel Asso-
ciation of New York City, September, 1926.

(*Now operating as the American Hotel &
Motel Association*).

**Exhibit  B - Page 1**

# UNIFORM SYSTEM
## OF
## ACCOUNTS FOR HOTELS

[Sixth Revised Edition]
Ninth Printing
1974

PRICE $5.50

HOTEL ASSOCIATION OF NEW YORK CITY, INC.
141 WEST 51ST STREET, NEW YORK, N.Y. 10019

Exhibit  B - Page 2

P30003175

Exhibit 1; Page 108



COPYRIGHTED BY THE HOTEL ASSOCIATION OF NEW YORK CITY, INC., 1961, IN
THE UNITED STATES AND DOMINION OF CANADA.

Printed in the United States of America
SCOTT PRINTING CORPORATION, NEW JERSEY

[iv]

Exhibit  B - Page 3

P30003176

Exhibit 1; Page 109

## PREFACE

The first edition of the Uniform System of Accounts for Hotels was prepared during the latter half of 1925 and the early days of 1926 by a designated group of accountants for the Hotel Association of New York City. It represented the first successful organized effort in the hotel business to establish a uniform system of cost accounts. The general scheme was in line with the best thought of hotel accountants, and subsequent revisions have been confined chiefly to simplifying and clarifying.

The Uniform System of Accounts for Hotels is in fact a manual of instructions for preparing standard financial statements and schedules of the various operating and productive units which make up a hotel. It serves two purposes: first, it provides a simple formula for the classification of accounts that may be adopted by any hotel regardless of size or type, and second, through the use of a standardized uniform method of presenting financial results of operations, it makes comparisons possible among several hotels or groups of hotels.

The manual was prepared in a form adaptable to all hotels, large or small, including the European plan, American plan, apartment and resort types. In order to do this it was necessary to provide for the peculiarities of each; consequently, the accounts and classifications given will not apply in full to any one hotel. Each hotel should select the schedules and accounts that are required for its use, and eliminate such as are not required. Certain hotels may have items of income or expense of a nature not provided for herein, in which case the required accounts should be included in the proper departmental schedules. Likewise, certain hotels may operate income-producing departments for which no provision has been made, in which case the required accounts should be kept under appropriate titles, and departmental names, in the same general form prescribed for the other departments.

All members of the original Committee, appointed by the Hotel Association of New York City to prepare a Uniform System of Accounts for Hotels, deserve commendation for their untiring devotion to the completion of this task. The personnel of these Committees were as follows:

*Proprietors' Committee*
E. M. STATLER, *Chairman—Hotel Pennsylvania*

L. M. BOOMER—The Waldorf-Astoria   JULIUS MANGER—Hotel Times Square
I. FLUEGELMAN—12 East 86th Street   FRED A. MUSCHENHEIM—Hotel Astor
DAVID H. KNOTT—Hotel Albert   CHARLES G. STAMM—Hotel Willard
ARTHUR L. LEE—Hotel McAlpin   GEORGE W. SWEENEY—The Commodore

[v]

Exhibit  B - Page 4

P30003177

Exhibit 1; Page 110

Exhibit
Page

## STATEMENT OF INCOME
### (Short Form)

Current
Period

**DEPARTMENTAL PROFIT (LOSS)**

| | | |
|---|---|---|
| Rooms | Schedule B- 1 | $ |
| Food | " B- 2 | |
| Beverages | " B- 2 | |
| Telephone | " B- 3 | |
| Barber Shop | " B- 4 | |
| Beauty Parlor | " B- 5 | |
| Checkrooms and Washrooms | " B- 6 | |
| Cigar and Newsstand | " B- 7 | |
| Fountain and Gift Shop | " B- 8 | |
| Garage—Parking Lot | " B- 9 | |
| Guest Laundry | " B-10 | |
| Swimming Pool—Cabanas—Baths | " B-11 | |
| Valet | " B-12 | |

| | | |
|---|---|---|
| **Profit from Operated Departments** | | $ |
| **OTHER INCOME** | B-13 | |
| **GROSS OPERATING INCOME** | | $ |

**DEDUCTIONS FROM INCOME**

| | | |
|---|---|---|
| Administrative and General Expenses | " B-14 | $ |
| Advertising and Sales Promotion | " B-15 | |
| Heat, Light and Power | " B-16 | |
| Repairs and Maintenance | " B-17 | |

| | | |
|---|---|---|
| **Total Deductions From Income** | | $ |
| **HOUSE PROFIT** | | $ |
| **STORE RENTALS** | B-18 | |
| **GROSS OPERATING PROFIT** | | $ |
| **RENT, MUNICIPAL TAXES AND INSURANCE** | | $ |
| **PROFIT BEFORE INTEREST AND DEPRECIATION** | | |
| **INTEREST** | B-19 | |
| **PROFIT BEFORE DEPRECIATION** | | $ |
| **DEPRECIATION AND EXPENSE AMORTIZATION** | B-19 | |
| **NET OPERATING PROFIT (LOSS)** | | $ |
| **OTHER ADDITIONS AND DEDUCTIONS** | B-20 | |
| **NET INCOME (LOSS)—To RETAINED EARNINGS** | | $ |

NOTES: Various arrangements of additional columns for comparisons and percentages
are illustrated on pages 96-99.
    It is suggested that when the "short form" as shown herewith is used that
a supplementary schedule of Revenue and Expenses be prepared as outlined on
Exhibit B, page 2, herewith.

[ 12 ]

**Exhibit  B - Page 5**

P30003178

Exhibit. B
Page 2

## CONDENSED STATEMENT OF REVENUE AND EXPENSES

**REVENUE**

    Rooms                               $

    Food

    Beverages

    Telephone

    Store Rentals

    Other Income

        Total Revenue                  $

**COSTS AND EXPENSES**

    Cost of Goods Sold

        Food                             $

        Beverages

        Telephone

        Other

    Total Cost of Goods Sold        $

    Payroll and Related Expenses

    Other Expenses

        Total Costs and Expenses     $

**GROSS OPERATING PROFIT**           $

**RENT, MUNICIPAL TAXES AND INSURANCE**

**PROFIT BEFORE INTEREST AND DEPRECIATION**   $

**INTEREST**                        $

**PROFIT BEFORE DEPRECIATION**

**DEPRECIATION AND EXPENSE AMORTIZATION**   $

**NET OPERATING PROFIT (LOSS)**        $

**OTHER ADDITIONS AND DEDUCTIONS**

**NET INCOME (LOSS)—TO RETAINED EARNINGS**   $

[13]

Exhibit  B - Page 6

P30003179

The Prudential Insurance Company of America
Capital Real Estate Investment Office
Suite 400
1150 - 17th Street, N.W.
Washington, DC 20036
Telephone: 202-833-2570

August 5, 1981

Hyatt Corporation
9700 West Bryn Mawr
Rosemont, Illinois  60018
Attn:  Harold S. Handelsman, Esquire

> Re:  I.P. #500
>      Hyatt Arlington
>      <u>Arlington, Virginia</u>

Gentlemen:

Section 4.2.2(a) of that certain Management Agreement dated
February 19, 1981, by and between THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA ("Prudential") and HYATT CORPORATION
("Hyatt"), provides that Hyatt's payment of Basic Fee shall
occur monthly "..... by a check in the amount of the tentative
monthly installments issued to Hyatt by Owner's Capital Real
Estate Investment Office, or its successor in responsiblity...".

Without waiving the aforesaid contractual right of Prudential
to pay the Basic Fee due under the Management Agreement to
Hyatt by check, or in any way releasing or renouncing the right
to at any time require the payment of Basic Fee to Hyatt by check
as provided in Section 4.4.2(a) as aforesaid, and for purposes of
administrative convenience only, Prudential hereby consents to
paying Hyatt its tentative monthly installment of Basic Fee by
allowing Hyatt to deduct its tentative monthly installment of
Basic Fee directly from the operating accounts of the Hotel each
month as the same shall become due and payable under Section 4.4.2
of the aforesaid Management Agreement.  This authorization shall
continue until Hyatt is notified in writing by Prudential of its
recision.

It is hereby agreed and understood that all other terms and
conditions of Section 4.2.2 and all other provisions of the
aforesaid Management Agreement shall remain and continue in full
force and effect.

Exhibit 1; Page 113

WAC00006149

Hyatt Corporation                    -2-            August 5, 1981

Hyatt hereby acknowledges and agrees that the authorization contained in this letter may be revoked at any time by Prudential in its sole and complete right and descretion.

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation

By: John C. Hoffman
    Vice President

ATTEST:

Assistant Secretary

The undersigned hereby agrees to the terms of the aforesaid letter.

HYATT CORPORATION, a Delaware corporation

By: Senior Vice President

ATTEST:

Assistant Secretary

DATE:

JCH/SJK/vfh

cc:  Ric Cardall
     Carol Wilkes
     Alan J. Ostroff
     Heinz H. Kern
     Gus P. Miranda

## AMENDMENT NO. 1 TO MANAGEMENT AGREEMENT

THIS AMENDMENT NO. 1 TO MANAGEMENT AGREEMENT (this "Amendment"), is made as of 15th day of June, 1994, by and between WILSON ARLINGTON COMPANY, A CALIFORNIA LIMITED PARTNERSHIP ("Owner"), and the HYATT CORPORATION, a Delaware corporation ("Hyatt"), with reference to the following facts and objectives:

      A.     Owner, as assignee of The Prudential Insurance Company of America, and Hyatt are parties to a Management Agreement dated as of February 19, 1981 as amended by a Letter Agreement dated August 5, 1981 (the "Management Agreement"), pursuant to which Hyatt, acting for the account of Owner, has operated and managed a certain hotel located in Arlington, Virginia commonly known as the Hyatt Arlington (the "Hotel").

      B.     On or about March 21, 1994, Owner filed a petition for reorganization under Chapter 11 of the United States Bankruptcy Code in case No. LA 94-20825VP in the United States Bankruptcy Court for the Central District of California, and Owner has recently sought the dismissal of the case with the consent of its secured lenders.

      C.     Owner and Hyatt desire to amend the Management Agreement as hereinafter set forth (the "Amendment").

      D.     In connection with the Amendment, an affiliate of the General Partner of Owner has agreed to assign to Hyatt a limited partnership interest in the Owner.   Such assignment is part of the consideration exchanged by the Owner and Hyatt with respect to the modifications contained in the Amendment and, together with the Amendment, constitutes an agency coupled with an interest, as that term is defined by applicable Virginia state law.

      NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.     <u>Amendment of Management Agreement.</u>

      1.1    <u>Amendment of Section 2.2.</u>  The first sentence of Section 2.2 of the Management Agreement is hereby deleted and replaced with the following:

      "Prior to January 1, 1999, Owner shall not be entitled to terminate this Agreement other than for cause pursuant to Section 11.1 hereof.  From and after January 1, 1999, in addition to any other right of termination under this Agreement, Owner shall have the right to terminate this Agreement without cause by giving to Hyatt a written notice specifying the date of termination, which shall not be earlier than nine (9) months from the first day of the month next succeeding the day of the notice of termination sent by the Owner."

1.2   <u>Amendment of Section 4.1(e)</u>.  Paragraph (2) of Section 4.1(e) of the Management Agreement is hereby amended to read in full as follows:

> "(2)  An amount equal to ten percent (10%) of the 'Project Cost' (as hereinafter defined) determined in accordance with generally accepted principles of accounting.  The Project Cost as of any date during the Term shall be the "Base Project Cost" of $21,800,000.00, plus any additions to Project Cost provided for in Sections 5.1(b)(iii), 6.3, 6.4, 9.1 and 10.5 hereof incurred prior
> to the date of determination of the Project Cost and after January 1, 1994, plus (if the date as of which Project Cost is being determined is on or after January 1, 1995) an amount equal to the aggregate deductions for the immediately preceding fiscal year made under Section 5.1 hereof with respect to the funding of the Reserve Account."

1.3   <u>Amendment of Section 4.2.1</u>.  Clause (a) of Section 4.2.1 is hereby amended to read in full as follows:

> "(a)  Hyatt shall receive a Basic Fee equal to the following:
>
> (i)  With respect to 1994, the Fixed Basic Fee for such fiscal year;
>
> (ii)  With respect to 1995, the greater of the Fixed Basic Fee for such fiscal year or five percent (5%) of the Gross Operating Profit for such fiscal year; and
>
> (iii)  With respect to 1996 and each fiscal year thereafter, the greater of the Fixed Basic Fee for such fiscal year or eight percent (8%) of the Gross Operating Profit for such fiscal year."

1.4   <u>Amendment of Section 4.2.2(b)</u>.  Section 4.2.2(b) of the Management Agreement shall be amended to read in full as follows:

> "(b)  With respect to each calendar month included in any such fiscal year, the tentative monthly installment on account of the Basic Fee for that month shall be calculated as follows:
>
> (i)     With respect to each calendar month included in fiscal year 1994, the tentative

2



monthly installment on account of the Basic Fee for that calendar month shall equal $8,333.33.

     (ii)    With respect to each calendar month included in fiscal year 1995, the tentative monthly installment on account of the Basic Fee for that calendar month shall equal (x) an amount determined by multiplying $8,333.33 by the number of months included in the Cumulative Period in respect of such month, or five percent (5%) of the Gross Operating Profit for such Cumulative Period, whichever is greater, less (y) the aggregate amount of the tentative monthly installments having theretofore become payable for such fiscal year on account of such Basic Fee.

     (iii)    With respect to each calendar month included in fiscal year 1996 or any fiscal year thereafter, the tentative monthly installment on account of the Basic Fee for that calendar month shall equal (x) an amount determined by multiplying $8,333.33 by the number of months included in the Cumulative Period in respect of that month or eight percent (8%) of the Gross Operating Profit for such Cumulative Period, whichever is greater, less (y) the aggregate amount of the tentative monthly installments having theretofore become payable for such fiscal year on account of such Basic Fee."

    1.5    <u>Amendment of Section 4.5</u>  Section 4.5 of the Management Agreement shall be amended to read in full as follows:

     (a)    "The Owner's Objective for any year is the receipt of net Owner's Remittance Amounts (the total of Owner's Remittance Amounts less Hyatt's Annual Management Fee) equal to ten percent (10%) of the "Performance Test Threshold Amount" (as hereinafter defined). The "Performance Test Threshold Amount" as of any date during the Term shall be an amount equal to the Project Cost as calculated pursuant to paragraph (2) of Section 4.1(e) hereof <u>except that</u> for purposes of this Section 4.5 and the calculation of the Performance Test Threshold Amount, the Base Project Cost shall be $18,000,000.00 rather than $21,800,000.00.

     (b)    If the Owner's Objective is not attained for fiscal 1999 and fiscal 2000 or any two consecutive fiscal years of

3

operation following fiscal 1999, then Owner may terminate this Agreement upon written notice to Hyatt of such termination, within ninety (90) days after the delivery of the year end Financial Statements pursuant to Section 7.4(a), which notice shall specify a date of termination, and Owner shall not be liable to Hyatt for any lost earnings resulting from such termination."

   1.6     Amendment of Section 11.1.  The following clause is hereby inserted at the beginning of the first sentence in Section 11.1:

          "Notwithstanding the coupling of Hyatt's power of agency with an interest as a result of the limited partnership interest held by Hyatt in the Owner,"

2.    Continuation of Management Agreement.

          Subject to the foregoing provisions of this Amendment, each and all of the covenants, conditions and other provisions of the Management Agreement are hereby affirmed, and the Management Agreement shall continue in full force and effect in accordance with its terms.

          IN WITNESS WHEREOF, Owner and Hyatt have executed this Amendment as of the day and year first above set forth.

                         WILSON ARLINGTON COMPANY,
                         A CALIFORNIA LIMITED PARTNERSHIP

                         By:     396 FORDYCE CORPORATION,
                                 a California corporation,
                                 as General Partner

                         By:     _____
                                 Douglas R. Riggs
                                 President

                         HYATT CORPORATION,
                         a Delaware corporation

                         By:     _____

4

Exhibit 1; Page 118

WAC00006147

ORIGINAL

## AMENDMENT NO. 2 TO MANAGEMENT AGREEMENT

THIS AMENDMENT NO 2 TO MANAGEMENT AGREEMENT (this "Amendment"), is made as of the _____ day of July, 1997, by and between WILSON ARLINGTON COMPANY, a California limited partnership ("Owner"), and HYATT CORPORATION, a Delaware corporation ("Hyatt"), with reference to the following facts and objectives:

A.   Owner, as assignee of The Prudential Insurance Company of America, and Hyatt are parties to a Management Agreement dated as of February 19, 1981 as amended by a Letter Agreement dated August 5, 1981, and Amendment No. 1 dated as of June 15, 1994 (the "Management Agreement"), pursuant to which Hyatt acting for the account of Owner, has operated and managed a certain hotel located in Arlington, Virginia commonly known as the Hyatt Arlington (the "Hotel").

B.   Owner and Hyatt desire to amend the Management Agreement as hereinafter set forth (the "Amendment").

NOW, THEREFORE, in consideration of the mutual covenants hereinafter set forth and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.   Section 5.1(b)(i) of the Management Agreement is hereby amended by increasing the "applicable amount" for deposits to be made to the Reserve Account to three percent (3%) of Gross Revenues; such increase to be effective as of August 1, 1997.



2.    All defined terms herein shall have the meaning ascribed to them in the Management Agreement.

3.    Except as modified and amended herein, the Management Agreement is hereby ratified and affirmed, and shall remain in effect in accordance with its terms.

IN WITNESS WHEREOF, Owner and Hyatt have executed this Amendment as of the day and year first above set forth.

<div style="margin-left:40%">

WILSON ARLINGTON COMPANY, a California limited partnership

By DR4 Company, L.L.C., a California limited liability company

By its Manager, Ring-Miscikowski Trust

By: _____
    Douglas R. Ring, Trustee


HYATT CORPORATION, a Delaware corporation

By: _____
    Peter Connolly, Vice President

</div>

2

Exhibit 1; Page 120

WAC00006143

**2**

VIRGINIA:

IN THE CIRCUIT COURT OF ARLINGTON COUNTY

| | | |
|---|---|---|
| WILSON ARLINGTON COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-1539 |
| | ) | |
| HYATT CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

THIS ACTION came before the Court upon the Plaintiff's notice of nonsuit, filed

November 6, 2009, and

IT APPEARING TO THE COURT that Plaintiff has not previously taken a nonsuit, and

that no counterclaim, cross claim or third party claim has been filed, it is therefore,

ORDERED that Plaintiff's Complaint is nonsuited pursuant to Virginia Code § 8.01-380.

ENTER. *november 6, 2009*

_____
Judge, Circuit Court of Arlington County

Dated: November ___, 2009

WE ASK FOR THIS:

_____
Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
(703) 714-7400
(703) 714-7410 (facsimile)
*Counsel for Wilson Arlington Company*

-1-

SEEN: *and objected to:*

_(signatures)_

Donnie L. Kidd, Jr. (VSB No. 44241)
Christopher Wynn (VSB No. 75991)
SQUIRE, SANDERS & DEMPSEY LLP
1201 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC 20004

Rodney R. Patula (*pro hac vice*)
SQUIRE, SANDERS & DEMPSEY LLP
One Maritime Plaza, Suite 300
San Francisco, California 94111

William D. Dolan, III (VSB No. 12455)
Michael W. Robinson (VSB No. 26522)
VENABLE LLP
8010 Towers Crescent Drive
Suite 300
Vienna, Virginia 22182
(703) 760-1684
(703) 821-8949 (facsimile)

*Counsel for Hyatt Corporation*



-2-

IN THE CIRCUIT COURT OF ARLINGTON COUNTY

| | |
|---|---|
| HYATT CORPORATION, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 07-161 |
| WILSON ARLINGTON CORPORATION, | ) |
| Defendant. | ) |
| WILSON ARLINGTON COMPANY, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 08-1539 |
| HYATT CORPORATION, | ) |
| Defendant. | ) |

## ORDER

THESE MATTERS came before the Court on April 16, 2009, following supplemental briefing by the parties, on Wilson Arlington's Motion for Sanctions and Other Relief, and in accordance with the Court's Order of September 26, 2008.  Upon consideration of the parties' briefs and oral argument of counsel, and for the reasons stated on the record,

IT IS HEREBY ORDERED THAT:  (1) the remainder of Wilson Arlington's Motion for Sanctions is GRANTED as follows:

(52)

$100,000

(1)    Wilson Arlington is awarded ~~$165,822.50~~ in reasonable attorney's fees incurred in connection with its two motions to compel and motion for sanctions against Hyatt.  ~~This amount includes $8,960 in attorney's fees for Wilson Arlington's first motion to compel against~~

-1-

~~Hyatt, $26,892.50 in attorney's fees for the second motion to compel against Hyatt; and~~ ⓢⓔ ⱪℳ

~~$129,970 in attorney's fees for the motion for sanctions and other relief.~~

(2)     Hyatt shall pay the full amount set forth in subparagraph (1) above within seven

days of the date of this Order;

(3)     Hyatt shall produce to Wilson Arlington *by June 1, 2009:* ⓢⓔ ⱪℳ

(a)   all documents responsive to Wilson Arlington's First and Second Set of

Requests for Production located in the electronic or hard-copy files of George Gudgeon, Anne

Hanch, Jim Melvin, and Chris Elam;

(b)   all communications and correspondence between Hyatt and Deloitte &

Touche, or between Hyatt and PricewaterhouseCoopers (or its predecessor, Coopers & Lybrand),

as requested in Request No. 2 of Wilson Arlington's First Set of Requests for Production;

(c)   a chart that identifies by name, subject, contracting parties, and effective date,

each National Contract, as that term is defined in Wilson Arlington's First Set of Requests for

Production to Hyatt, that indicates whether such agreement has already been produced, and, for

each such agreement that has not been produced, that details how Hyatt has searched for that

agreement, including the files searched and search criteria and terms used.

(d)   documents that show the ownership structure of Hyatt, including any changes

thereto between January 1, 1980 and December 31, 2006, and documents that show the legal

relationship between Hyatt, its owners, parents, subsidiaries, on the one hand, and any Related

Party (as that term is defined in Wilson Arlington's First Set of Requests for Production) doing

business with the Hotel between January 1, 1980 and December 31, 2006;

-2-

(e)  a copy of any internal directive issued by Hyatt for the preservation of documents related to this litigation, including a list of the individuals or departments to which such directive was sent; and

(f)  a certification from an officer of Hyatt that sets forth the names of the individuals whose documents were searched to respond to Wilson Arlington's document requests, the files that were searched for responsive documents, including whether such files were maintained electronically or in hard-copy format, and the search methods and terms, if any, used to locate responsive documents.

(4)  ~~Hyatt shall pay to Wilson Arlington a fine of $1,000 per day until it has delivered all the items listed in subparagraph (3) above.~~

(5)  The parties shall return before the Court on *June 15*, 2009, at *10 a.m.* to address whether Hyatt has fully complied with this Order.

ENTER.

*James L. Almand*
Judge, Circuit Court of Arlington County

Dated: April *16*, 2009

WE ASK FOR THIS:

Stuart A. Raphael (VSB No. 30380)
Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
1751 Pinnacle Drive, Suite 1700
McLean, Virginia 22102
(703) 714-7400
(703) 714-7410 (facsimile)

*Counsel for Wilson Arlington Company*

-3-

SEEN AND _Object_ :

_[signature]_

John A. Burlingame (VSB No. 32694)
Donnie L. Kidd, Jr. (VSB No. 44241)
Kevin M. Blair (VSB No. 72737)
SQUIRE, SANDERS & DEMPSEY LLP
1201 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC 20004

Rodney R. Patula (*pro hac vice*)
SQUIRE, SANDERS & DEMPSEY LLP
One Maritime Plaza, Suite 300
San Francisco, California 94111

*Counsel for Hyatt Corporation*

-4-